JULIA GADDY, Respondent, v. SKELLY OIL COMPANY, Appellant, No. 43165—259 S. W. (2d) 844.

Division Two, July 13, 1953.

*Norris H. Allen, Anderson, Gilbert, Wolfort, Allen & Bierman,
Eugene E. Northern* and *Breuer & Northern* for appellant.

*Llyn Bradford, Neale, Newman, Bradshaw, Freeman & Neale* and
*Jean Paul Bradshaw* for respondent.

BARRETT, C.—Skelly Oil Company is the appellant from a $15,000 judgment in favor of Mrs. Julia Gaddy for the death of her husband, Clarence Gaddy. Mack Waldron and Clarence Gaddy were employed by the Rhodes Hardware Company in Rolla as deliverymen, repairmen and installers of gas hot water [846] systems and other appliances. Rhodes Hardware was a distributor of "Skelgas" (liquefied petroleum gas, known as propane) and "Skelgas" appliances, and on August 28th, 1950 entered into an agreement to supply cylinders of propane and the necessary appliances for the hot water heater in Mrs. Crane's apartment house at 688 Salem Street. On Monday afternoon,

October 2, 1950, about 3 o'clock, Waldron and Gaddy, in attempting to light the extinguished pilot light on the hot water heater in Mrs. Crane's basement, ignited a cigarette lighter and immediately there was an explosion and flash fire which resulted in serious personal injuries to Waldron and eventually in Mr. Gaddy's death. This is a companion case to Waldron v. Skelly Oil Company, 257 S. W. (2) 615, and, except for certain notable differences in the testimony, the facts in the two cases "are substantially the same." The sole question upon the appeal in this case, as in the Waldron case, is whether the evidence adduced by Mrs. Gaddy in support of her claim is of such substantial probative force that a jury should be permitted to draw the necessary inference of negligence and consequent liability on the part of Skelly Oil Company for Mr. Gaddy's death.

The hot water heater and its mechanism in the basement belonged to Mrs. Crane. It was a "Servel" heater which she had purchased from the Rolla Uregas Company, Under its agreement with Mrs. Crane, the cylinders and appliances outside the house belonged to Skelly Oil Company. In addition to the cylinders these appliances consisted of a stand for the tanks, the necessary connecting pipes and a regulator, which the plaintiff claims was defective. The outside appliances had originally been installed at another of Mrs. Crane's properties on East Sixth Street on August 28, 1947. On direct examination Mrs. Crane said that they had been standing there (on Sixth Street) unused for several months. On cross-examination she said that the equipment had been in use at the Sixth Street property from September 28, 1947 until the day she requested Rhodes Hardware to transfer it to 688 Salem Street. In any event, prior to the 1st day of September 1950, the outside appliances were transferred from Mrs. Crane's Sixth Street property to 688 Salem Street and connected with the hot water heater. Skelgas was delivered and attached and the heater worked satisfactorily during the month of September 1950. In addition to the hot water heater Mrs. Crane's apartment house was equipped with other gas appliances requiring liquefied petroleum gas, stoves for cooking and individual heating units. These appliances were supplied with gas by another dealer in liquefied petroleum, the Rolla Uregas Corporation.

Initially there were four defendants to Mrs. Gaddy's action for the negligent death of her husband, William E. Rhodes, doing business as Rhodes Hardware Company, Rolla Uregas Corporation, Uregas Service Incorporated of Moberly, and Skelly Oil Company. It was alleged that her husband was fatally injured "as a result of the negligence of all of the defendants and each of them combined with the negligence of each other in that said defendants and each of them wholly failed to act with a high degree of care in the installation of safe equipment and in the distribution and delivery of Skelgas and Uregas to said premises * * *." As to Rhodes Hardware Company, it was alleged that the hardware was an authorized distributor of Skelly Oil Company's

products and that the hardware negligently delivered liquefied petroleum not effectively odorized as required by law. It was alleged that Rolla Uregas and Uregas Service were engaged in the distribution of liquefied petroleum products and appliances and that they had agreed to supply Mrs. Crane's apartments with gas. It was alleged that these companies sold Mrs. Crane the "Servel" hot water heater and that it was defective and caused a leakage of gas into the basement. It was also alleged that certain other equipment sold by these defendants was defective and dangerous, and that they sold and delivered liquefied petroleum not odorized as required by law. As to Skelly Oil Company it was alleged that through its agent and distributor, Rhodes Hardware Company, it "negligently installed defective equipment" and that it had "actual knowledge" that its unodorized propane had leaked into and permeated the basement. At the opening of the trial the plaintiff voluntarily dismissed her cause as to Rolla Uregas and Uregas Service and the court required that the dismissal be with prejudice. At the close of all the evidence the court sustained Mr. Rhodes' motion for a directed verdict. The liability of Skelly Oil Company was submitted upon the sole hypothesis and specification that "there was a defect in the regulator," a part of its equipment outside the house, and that Skelly Oil Company knew or should have known that its regulator was defective. Thus it comes about that the specific question upon this appeal is whether there is any evidence that the regulator on the equipment outside the house was defective as hypothesized and submitted in Mrs. Gaddy's principal instruction.

Certain preliminary information is necessary, however, to an understanding of the specific question. As we have said, Skelly's outside equipment, including the regulator and a cylinder, or cylinders, of gas were transferred and attached to the "Servel" heater in Mrs. Crane's basement on or before September 1, 1950, and they operated satisfactorily throughout the month of September. Three or four days prior to September 30th, perhaps as early as September 24th, the tenants noticed that there was no hot water and on Saturday morning, September 30th, 1950, Mrs. Crane ordered another cylinder of "Skelgas" from the Rhodes Hardware. That afternoon, about one o'clock, Mack Waldron and Gaddy delivered another cylinder of gas to 688 Salem Street. Waldron said he knocked on the door but there was no one at home and neither he nor Gaddy knew what appliance the cylinder was connected with in the basement. Nevertheless he and Gaddy disconnected the empty cylinder, hooked on the newly delivered one, and turned the gas on by turning on the valve on the cylinder outside the house. That night and Sunday, for the first time, the tenants began to smell the odor of gas and on Monday morning reported the fact to Mrs. Crane and she in turn reported to Mr. McWhorter at Rhodes Hardware. About one o'clock McWhorter and George Moser went to the apartment to check what was said to be a gas leak. Moser, a plain-

tiff's witness, said that he smelled no gas until he got his head down within ten inches of the heater. He did not know who had turned it, but the unitrol device on the heater was then turned ".off." Moser said that McWhorter told him that he smelled gas but, since he was not a serviceman, they wouldn't do anything about it. McWhorter turned the gas "off," on the cylinder outside, and they left without checking further. After they returned to the hardware, McWhorter told Waldron and Gaddy to go to Mrs. Crane's "to light the water heater." Waldron says that McWhorter did not say anything about a gas leak or the odor of gas, they were just to light the heater—the pilot light.

It was about 3 o'clock in the afternoon when Waldron and Gaddy arrived at Mrs. Crane's apartment. Upon arrival they turned the gas on at the cylinder outside, knocked at an apartment door to inquire the way to the basement and were directed to an adjoining apartment for the stairway to the basement. They knocked at Mrs. Foran's door and she admitted them to the basement. Waldron says that he and Gaddy did not smell the odor of gas and he denies that Mrs. Foran or anyone else warned them of gas in the basement. Five, six, seven, eight or ten minutes elapsed from their turning the cylinder on outside until their attempt to light the burner. They did not turn the unitrol valve "on" or the pilot light. Waldron "hunkered" down in front of the heater and struck four matches but they would not ignite. Gaddy handed him a cigarette lighter and as soon as he ignited the lighter there was an explosion and a flash fire which extended up into the living room in the apartment above.

No plaintiff's witness examined the basement or the appliances following the explosion and fire. Defendant's witnesses, a state oil inspector, a mechanical engineer from the Rolla School of Mines and Mr. Rasmussen, the manager of Rolla Uregas, did examine the appliances and they found, when the gas was turned on outside, that gas was escaping through the unitrol device, the 100% safety valve, on the heater. Mr. Rasmussen, whose company sold the heater ▮▮▮ to Mrs. Crane, testified in detail to the defect in the unitrol device. In fact all the witnesses who gave evidence concerning this device said that it was defective. As will be noted, however, one of the plaintiff's witnesses explained that the defect in this device had nothing to do with the explosion. On December 1, 1950, at the request of those representing Skelly Oil Company, the cylinder of Skelgas, the outside appliances, including the regulator and the unitrol device were disconnected from Mrs. Crane's heater and stored in Mr. Courson's warehouse and they were not seen or examined again by anyone until April 1951. It is obvious up to this point, as the plaintiff concedes, that there is no evidence of a defect or of negligence with respect to the regulator. To establish a defect in the regulator on October 2, 1950 the plaintiff relied upon the testimony of an expert witness. And the precisely determinative question is whether the testimony of that witness is of

such substance and probative force that a jury could reasonably draw the inference of a defective regulator, and hence negligence on the part of Skelly Oil Company, from it.

In this connection, as the plaintiff urges, it is not the province of this court to pass upon the weight of evidence, and in considering whether the plaintiff's evidence is sufficient to sustain the hypothesis of her principal instruction (Guthrie v. City of St. Charles, 347 Mo. 1175, 1184, 152 S. W. (2) 91, 95) and hence the verdict, defendant's evidence in conflict with the plaintiff's evidence must be disregarded. Costello v. M. C. Slater, Inc., (Mo. App.) 220 S. W. (2) 947, 950. It is also immaterial that the plaintiff has but a single witness to support her theory and hypothesis and the defendant many witnesses, if the testimony of the plaintiff's single witness is substantial evidence it will suffice to support her verdict. Gilbert v. Mississippi River & B. T. R. Co., (Mo. App.) 226 S. W. 263, 264. The jury is not to be deprived of its right and function to find some of the facts, even some facts essential to the plaintiff's case, by reasoning upon the evidence, even circumstantial evidence, and inferring from such evidence that a certain required thing or fact existed or was true. Hardwick v. Kansas City Gas Co., 355 Mo. 100, 107, 195 S. W. (2) 504, 508. But firmly established as these fundamentals may be, they have no application, as will appear, to facts or evidence as to which the plaintiff has no testimony whatever and the only testimony concerning a fact in issue is that given by the defendant. Furthermore, while this court may not concern itself with the weight of evidence, it is the duty and function of this court to determine whether the plaintiff's testimony is substantial (Graney v. St. L., & I. M. & S. Ry. Co., 157 Mo. 666, 680, 57 S. W. 276), in short, to determine as a matter of law whether there is any evidence to sustain an issue of fact. Ducoulombier v. Thompson, 343 Mo. 991, 1001, 124 S. W. (2) 1105. It is the province of this court to say whether a jury could reason upon the facts established by the evidence and infer from them, otherwise than by guess and conjecture, the further necessary facts demonstrating a breach of duty, negligence and consequent liability, here with respect to the regulator. McGaugh v. City of Fulton, 356 Mo. 1122, 1129, 205 S. W. (2) 547, 550.

As will more clearly appear, it became debatable, at the conclusion of all his testimony, whether the plaintiff's witness in this case was in fact qualified to examine the regulator and express an opinion upon the essential issue of whether it was defective, but we are not concerned here with the problem of whether the admission of his testimony constitutes reversible or prejudicial error. Robison v. Chicago Great Western R. Co., (Mo. App.) 66 S. W. (2) 180. The trial court found, as a preliminary matter, that the witness was qualified and it is not necessary to a determination of this case to say whether the trial court abused its discretion in this respect. Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2) 120. It is well to note, however,

150

that an expert witness is one who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or of deducing correct conclusions. 20 Am. Jur., Sec. 783, p. 656. Because of his special knowledge an opinion by an expert witness, ''when not a mere guess or conjecture ▮▮▮ but an inference drawn by one of requisite experimental capacity from adequate data, is evidence'' and such testimony is evaluated and measured by the same standards as so-called fact testimony. Scanlon v. Kansas City, 325 Mo. 125, 150, 28 S. W. (2) 84, 95. It must be emphasized that the expert's opinion must not be a mere guess or conjecture but must be based upon facts and adequate data (Vitale v. Duerbeck, 338 Mo. 556, 567, 92 S. W. (2) 691, 695; Cardinale v. Kemp, 309 Mo. 241, 274 S. W. 437) and his ''positive opinion must have to support it, reasons and testimony which will give it sufficient probative force to be substantial evidence.'' Kimmie v. Terminal R. Assn., 334 Mo. 596, 605, 66 S. W. (2) 561, 565. The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force and ''The question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for this court.'' Hall v. Mercantile Trust Co., 332 Mo. 802, 820, 59 S. W. (2) 664; Ambruster v. Levitt Realty & Inv. Co., 341 Mo. 364, 374, 107 S. W. (2) 74.

▮ Mrs. Crane's apartment basement in which the heater was located is ten by twelve feet square, with a six-foot ceiling, and there is a small window in the east end of the basement near the ceiling, and Moser says that when he and McWhorter left at one o'clock on Monday the basement window was open. An empty propane cylinder weighs 70 pounds, they are 100 pound cylinders and filled weigh 170 pounds. When the cylinder of ''Skelgas'' attached to Mrs. Crane's heater was weighed in April by the plaintiff's expert the cylinder and contents weighed 124 pounds which, subtracted from 170 pounds, indicated that 46 pounds of gas had escaped or flowed from the cylinder between the time it was delivered and turned on at 3 o'clock on Saturday, September 30th and McWhorter's turning it off at one o'clock on Monday, October 2nd. The heater when on, with the unitrol valve open, consumed one pound of gas an hour and the 46 hours elapsing between Saturday and Monday would account for the 46 pounds of gas used. It was the defendant's theory that the gas which exploded had accumulated in the basement during that period of time through the defective unitrol device, the pilot light being extinguished. As indicated, everyone conceded that the unitrol device on the heater was defective. The plaintiff's expert conceded that it was defective in one respect, but it was his testimony that the defect did not have anything to do with any escaping gas or the explosion. He testified that any gas in the basement at one o'clock on Monday would have been dispelled after

McWhorter cut the outside tank ''off'' and left with the window open. He said that if the valve on the unitrol device was turned ''off'' and the outside valve was ''off'' at one o'clock and was not turned ''on'' again until 3 o'clock that there was no way for gas to have escaped into the basement in explosive quantities. It is not necessary to set forth in detail this witness' description of the unitrol device and its operation. Nor is it necessary, at this point, to set forth his testimony that the regulator so reduced the pressure from the tank that it entered the gas line at 4 to 6 pounds pressure (not ounces) and was later reduced to 4 to 6 ounces pressure as it reached the burner. These facts are set forth and reviewed in the Waldron case.

It will be recalled that Waldron and Gaddy arrived at Mrs. Crane's apartment about 3 o'clock on Monday afternoon. They turned the outside cylinder ''on'' and five to ten minutes elapsed before they entered the basement and attempted to light the heater. It is the plaintiff's theory that the explosive quantity of gas escaped through the defective regulator and into the basement in that 5 to 10 minutes. The plaintiff's theory upon this phase of the case is indicated by these questions and answers on direct examination: ''Q. Now, then, if the valve outside at the tank also at one o'clock was turned off and wasn't turned on until some time after 3 o'clock, would there have been any way at all for any gas to get out of that cylinder outside and to have come into the basement before 3 o'clock on this Monday afternoon? A. No, sir, there would not. Q. All right. Now, Doctor, the testimony shows that Mr. Gaddy and Mr. Waldron went down into the basement and that they struck a match but before they ever touched this manual valve; in other words, it is still remaining in the 'off' position, they had turned it on outside, had come around the house and gone down into the basement and then struck a match—a lighter, cigarette lighter, rather, and the explosion occurred while this was in the 'off' position. Now, Doctor, what does that indicate to you? A. There is only one thing that it would indicate, is the fact that this regulator was not operating properly, it allowed gas to enter this line going into the house at pressures greater than 12 pounds. Q. All right. Now, is there any other way in the world that it could happen? A. No, sir.'' His theory is further explained on cross-examination by these questions and answers: ''Q. * * * Then, as I understand your theory, Mack Waldron goes out there when he comes back at 3 o'clock and he turns it on at the tank and this was still off at the bottom, the main manual valve was off, wasn't it? A. Yes, sir. Q. Now, it is your theory that to get enough gas in there, assuming that that is the gas that caused the explosion, that something—some excess pressure had to push this valve open during the few minutes that it took Mack Waldron to run around and see this woman and come down in this basement; that is your theory in this lawsuit, isn't it? A. Yes, sir. Q. All right. And that is based on two things: one, that all the gas that went in there before

was gone, that the only gas that caused it was the gas that went in there during the time this valve was shut off and during the few minutes it took Mack Waldron to make that circle. That is right, isn't it? A. Yes, sir.''

The regulator was not examined or tested immediately after the explosion on October 2, 1950, while it was attached to Mrs. Crane's hot water heater. It was removed to a warehouse in December and examined for the first time in April 1951. On that occasion the plaintiff's lawyers and the defendant's lawyers together with the plaintiff's expert witness, Dr. Walter A. Quebedeaux, went to Mr. Courson's warehouse and looked at the cylinder, the unitrol device and the regulator. Unknown to defendant's counsel Dr. Quebedeaux returned to the warehouse alone and made a further, in fact the first, examination of the regulator, and that examination and his testimony concerning it is the crux of this case.

Dr. Quebedeaux is a ''consultant chemist and engineer.'' He has several degrees including the degree of Doctor of Philosophy in organic chemistry, and he has been employed as a research chemist and in public health work. It would serve no useful purpose to explore his testimony that the regulator, in normal operation, reduced the downstream pressure of the gas to 4 to 6 pounds, or to examine his testimony concerning the unitrol and its valves. For the purpose of illustration and to test its probative force only the salient, crucial parts of his testimony are examined. But first, it must be borne in mind, before Mrs. Gaddy has a submissible case, that it must be found from his testimony not only that the regulator was defective when he examined it in April 1951, but that it was defective on October 2, 1950. McGaugh v. Fulton, supra; Raftery v. Kansas City Gas Co., (Mo. App.) 169 S. W. (2) 105, 110. There are but two bits of testimony from which the plaintiff would have that inference drawn. First, he said that when he examined the regulator in April and found it defective, there were no wrench marks on the nuts and fittings, indicating that it had not been opened and therefore had not been repaired or serviced by Skelly. There was a rose wasp's nest on the diaphragm (discussed in the Waldron case) when he opened the regulator and it was inferentially suggested during the trial, respite the equivocal character of her testimony on this point, that the nest may have gotten in the regulator when it was not in use at Mrs. Crane's Sixth Street property.

Dr. Quebedeaux said that the first thing he did was to test the regulator and his test demonstrated that it was not functioning properly, indicating that it was defective. This is his unequivocal description, on direct examination, of his test: ''Q. All right, Now, then, tell us what kind of equipment you had with you? A. I had a tank of oxygen *with some fittings* and a few tools. Q. Did you take this piece of equipment, hook it onto the tank of oxygen and try to put air through it? A. Yes, sir. Q. Would any go through? A. No,

sir. Q. Did you have a valve so that you could test the pressure you were putting on it? A. Yes, sir, I had a pressure gauge. Q. All right, sir, tell the jury how much pressure you put to this thing trying to get anything through it? A. I put 70 pounds on the upstream side of that regulator and could not get anything through.''

On cross-examination he described in detail the equipment he had, including the "fittings." Upon a re-examination of the regulator, in the courtroom, he admitted that all the threads on the fittings were left-hand, "female," and he had no left-hand fittings. The following is his cross-examination as to his test of the regulator: ''Q. You say that when you went up there you encountered this left-hand thread here, didn't you? A. Yes, sir. Q. And you didn't have any left-hand fittings to hook up, did you? A. That is correct. Q. Now, you are positive of that? A. Yes, sir. Q. *You are positive you took that out?* A. *Yes, sir.* Q. *And then you took out the next one?* A. *Yes, sir.* Q. And you hooked up your fitting on the next one by taking this piece out? *No, I don't want you looking that over,* I want you to tell me what you did? A. *I took it out.* Q. *You took this out?* A. *Yes, sir, I took it out.* Q. And you put something else in in lieu of it that you hooked up your business to,—your pressure affair? A. *But what I want to examine on that is to be sure that that thing is not formed into a jet on the bottom, that is what I want to be sure about.* Q. And if you find it is formed to a jet on the bottom then you wouldn't have taken it out, is that it? A. *Then I was incorrect in stating that I took it out and attached it up.* Q. *Well, it is a jet on the bottom, isn't it?* A. *Yes, sir.* Q. *So you didn't take it out, did you?* A. *No, sir.* Q. And you didn't know you didn't take it out until after you had—you were cross-examined again about it, is that right, just now; you know you didn't take it out? A. *Yes, sir.* Q. Why didn't you know that a few minutes ago? Well, I don't remember everything. Q. Was it because you had testified you didn't have any left-hand fittings and this has the left-hand fitting? A. I don't have a left-hand fitting. Q. All right, then, tell us what you did? A. *I put a right-hand fitting in it and doped up the end of the right-hand fitting with string and I filled it up and put shellac on it so that I could force it in.* \* \* \* Q. *Now, as a matter of fact, if you did take it out and you put this thing down in there the whole regulating system was upset, wasn't it? A. Yes, because you wouldn't have a seat for that valve plunger to push on.*''

Whether there was in fact some mechanical or other defect in the regulator is immaterial, at this point; this test and the testimony of this witness concerning the test is the only evidence relied upon as demonstrating as a matter of fact that the regulator did not perform its normal and proper function of adequately reducing the gas pressure. It would serve no useful purpose to characterize this test and the testimony concerning it, it is sufficient to say, if his testimony is not

self-destructive, that it does not constitute substantial, probative evidence, particularly when it is considered that this is the only evidence from which a lay jury is to draw the essential and hypothesized inference of defective regulator, negligence and consequent liability. Fuchs v. City of St. Louis, 167 Mo. 620, 645, 67 S. W. 610; Brands v. St. Louis Car Co., 213 Mo. 698, 112 S. W. 511.

After making the described test Dr. Quebedeaux took the regulator apart to find out why it did not function properly. On direct examination he said, "* * * I found that seat stuck, so then I loosened these, all these nuts (inside the regulator) and took this top off and then I manipulated the diaphragm to pull that lever off of that seat. * * * I found that on the under side of this diaphragm it had an egg sack that the rose wasps—that the female of the species makes to plant the eggs in and for the young that are hatched the following year. It was about an inch and a quarter, I believe, in length, and it was made out of rose petals—rose leaves, and I found on this seat there was a sticky substance on it and there were evidences of foreign material on that seat and the seat was glued into this plunger and it had to be freed manually before it would come loose. * * * and *the diaphragm* had evidently lost *some of its pliability* and the seat had this sticky material on it that caused it to stick." It was his opinion that a diaphragm in that condition was "very unreliable, sometimes it will work properly and then just the next period of time it will start operating erratically, you can't predict how it is going to operate." He stated that he used a pocket knife and removed the sticky material from the diaphragm. When he testified in the Waldron case he said that the diaphragm was "an asphalt material," or "cloth impregnated with tar," and that the inside surface of the cast iron regulator was rusty. Upon the trial of this case Dr. Quebedeaux examined the diaphragm and said that it was "dead and unalive."

Upon cross-examination, as to the composition of the diaphragm he said that it was not an asphaltic material,—"No, it is a rubber material that is backed onto a canvas. * * * Well, I didn't remember that it was rubber and I was testifying from what my experience has been." As to the rust pits in the regulator the question was: "Q. Well, do you think that any pits you can see on that had anything on earth to do with the way it functions? A. No, sir. Q. * * * And the machined surfaces where the diaphragm fits around down there, they are nice and smooth, aren't they? A. Yes, they are smooth to the touch. Q. All right, now, take this actuating part here where there is a hinge at where the piece fits on the diaphragm, it works perfectly freely, doesn't it? A. Yes, sir. Q. And the little valve that seats up against the outside there where the stuff comes in, that shows a nice smooth round ring where the seating part is, doesn't it? A. Yes, sir, and I testified at the last case that I cleaned that off. * * * Q. Now, do you have any idea when these rose petals got in

there? A. No, sir. * * * Q. Does this look to you like, as a chemist, there was anything stuck on that at all? A. It doesn't now. I cleaned it off, I just testified.'' Nevertheless, it was his conclusion that ''The only thing wrong with the regulator was that the seat was stuck to the jet on the upstream side.'' Incidentally, the regulator was introduced in evidence and it is here before the court, dismantled.

There is one other fact concerning the regulator about which there is no conflict in the testimony that makes an analysis of Dr. Quebedeaux's testimony that the regulator was defective in the respects pointed out unnecessary. As to this particular fact there is no evidence or explanation on behalf of the plaintiff, hence it is not a question of weighing evidence, or of considering the defendant's evidence, there was no other evidence or proof of the fact and it stands undisputed and uncontradicted. On the side of the regulator there is a safety device—a ''pop-off valve.'' In the event of an excessive pressure of gas in the regulator, that valve opens or ''pops off'' and the gas is discharged into the atmosphere outside the building. When confronted with this device in the Waldron trial Dr. Quebedeaux said that it was ''an air vent.'' Upon this trial he was again examined concerning this valve: ''Q. Now, you were examined also at the last trial as to what this little screen on this little round device is on the back of this regulator, weren't you? A. Yes, sir. Q. And you said at that time that that was an apparatus to let the thing breathe? A. That is correct. Q. And that that is the only purpose of it, didn't you? A. I don't remember whether I said it was the only purpose, but that is one of the purposes. Q. Well, now, let's see. Do you remember this question: 'Is that what you call a vent?' and you said 'Yes, that is your vent, the up side,—upper portion of the diaphragm.' 'Question: The only purpose of that is to let atmosphere get in on the other side of the diaphragm? Answer: Uh huh. Question: Is that your statement to the jury? Answer: That is correct.' * * * Do you remember this question: 'Now, you are absolutely certain that this vent that we are talking about serves no other purpose than to let atmospheric pressure in on the other side of the diaphragm?' and you said 'Yes, sir.' Do you remember that? A. That is what it says there, that is what I— Q. Well, that's all you knew about it then, isn't it? A. That's all I knew about it at that time. Q. Now, then, since then have you learned that this not only is a vent to let air around on this side but that on the gas side there is a blow-out valve or an air pressure release valve; you know that now, don't you? A. *There is an excess flow valve there, yes, sir. Q. You know that now?* A. *Yes, sir.* Q. All right. Don't you know,—have you since learned that at 1 ½ pounds or one pound that will pop off and let the gas out into the yard? A. No, sir, I haven't learned that.'' There is no evidence or claim that the ''pop-off valve'' was defective, or did not function, or that it would not function by reason of the defects Dr. Quebedeaux attributed

to the regulator. Before the Waldron trial the regulator was tested by the defendant's witnesses and their undisputed testimony is that the valve did "pop-off" at 17 ounces, or "at around a pound and three-tenths."

As we have said, the noted testimony—and it is the essence of the plaintiff's case—is illustrative and there has been no attempt to analyze in detail, contrast, or to demonstrate the fallibility and inherent weakness in Dr. Quebedeaux's testimony from which it is sought to draw the necessary ultimate inference of negligence with respect to the hypothesized defective regulator. Dr. Quebedeaux examined the appliances and testified to what he found to be the physical facts, and, in addition, he testified hypothetically largely upon the basis of those facts, to every conceivable theory of liability, and there is no valid objection to his doing so. 20 Am. Jür., Sec. 776, p. 648; annotation 82 A. L. R. 1338; Atchison, Topeka & Santa Fe Ry. Co. v. Hamilton Bros., 192 F. (2) 817; Katz v. Nee, 74 F. Supp. 783; Brown v. Quincy, Omaha & K. C. R. Co., 127 Mo. App. 614, 106 S. W. 551. The difficulty is that even these briefly stated illustrations demonstrate that his testimony as to the physical facts as well as to the theories of the plaintiff's case and the appellant's liability, is at best mere conjecture and speculation and does not constitute substantive, probative evidence upon which a jury could reason and find the ultimate facts and liability. Waldron v. Skelly Oil Co., supra. The following cases and their basic philosophies are applicable to and govern this case in all its essentials: Ensign-Bickford Co. v. Reeves, 95 F. (2) 190; Ambruster v. Levitt Realty & Inv. Co., supra; Raftery v. Kansas City Gas Co., supra; Brands v. St. Louis Car Co., 213 Mo. 698, 112 S. W. 511; Fuchs v. City of St. Louis, 167 Mo. 620, 67 S. W. 610; Ducoulombier v. Thompson, supra; Dempsey v. Horton, 337 Mo. 379, ▮▮▮ 84 S. W. (2) 621. It follows that the trial court erred in submitting Skelly Oil Company's liability upon the hypothesis of "a defect in the regulator," a defect which proximately caused Mr. Gaddy's death.

This view makes it unnecessary to consider whether Mr. Gaddy "incurred whatever risk attended his duties as a skilled service man," or whether he was guilty of contributory negligence as a matter of law. In accordance with the views expressed in this opinion the judgment is reversed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.