**EXECUTIVE BOARD OF MISSOURI BAPTIST GENERAL ASSOCIATION, a corporation; Dell Duncan, Respondents,**

**v.**

**Everett K. CAMPBELL, K. L. Hancock, Roger P. Campbell, J. J. McManus, Albert R. Wolf and George D. McIlrath, Trustees of a Common Law Trust, doing business under the name and style of E. K. Campbell Company, Appellants.**

**No. 22008.**

Kansas City Court of Appeals.

Missouri.

Jan. 10, 1955.

J. E. Taylor, Jefferson City, for appellants.

C. J. Quimby, Jefferson City, for respondents.

SPERRY, Commissioner.

This is a suit, based on negligence, for recovery of property damages and damages for personal injuries sustained by plaintiffs as a result of two explosions of an oil furnace.

Plaintiffs were the Executive Board of Missouri Baptist Association, a corporation, hereafter referred to as the Board, and Dell Duncan, employed by the Board as janitor of its building. The Board constructed a building in 1949, and contracted with E. K. Campbell Company, hereafter referred to as Campbell, to install a new oil burning forced air heating plant, in their building. Defendants, L. E. Woodman and Claude

E. Davidson, were separately engaged in the servicing of heating systems and, from time to time, serviced this heating system, although they were not connected with its sale or installation. The trial court directed a verdict for both Woodman and Davidson, from which action no appeal was taken.

Installation of the oil furnace and heating system was completed in August, 1949, and, on January 8, 1951, the furnace exploded, causing damages to the Board's property. Repairs were made by the Board and, on November 8, 1951, said furnace exploded, causing great damage to the building and contents, interrupting the Board's work, and causing severe personal injuries to Duncan.

Plaintiffs' petition is in three counts. The first dealt with the explosion of January, 1951, the second deals with the explosion of November, 1951, and the third deals with personal injuries suffered by Duncan in the latter explosion.

Plaintiffs allege, in the first count, that Campbell negligently designed and installed the furnace, excepting the flue; that it also negligently designed and installed the fan chamber of the heating system, with a wall which leaked air so that the fan drew air downward through the flue, furnace, furnace room and, in turn, into the fan chamber, creating a reverse or down draft, which delayed the discharge of fuel vapors from the firing chamber, through the flue, and charged that unlighted fuel vapors were further negligently permitted to accumulate in the firing chamber because Campbell failed to equip, regulate and adjust the burner so that it would not "slobber" or leak unignited oil and vapors into the firing chamber; that ignition of said fuel and vapors was further delayed because the burner was negligently equipped with only one pair of electrodes when the exercise of reasonable care required that it be equipped with two pairs to ignite the fuel sprayed from the dual nozzle with which the burner was equipped; that the accumulation of such fuel oil and vapors was dangerous and likely to cause an ex-

plosion within the furnace; that, in November, 1950, at Campbell's suggestion, the Board obtained the services of Woodman to service the furnace from time to time, and that Campbell and Woodman negligently failed to correct, cure and repair the dangerous conditions aforesaid so that, on January 8, 1951, a violent explosion occurred in the furnace by reason of said conditions, causing damages to the building and furnishings to the extent of $2,210.79.

In count two, after alleging Campbell's negligent construction, installation, and maintenance of the furnace, as hereinbefore mentioned, plaintiffs alleged that the Board engaged Davidson from time to time to maintain, adjust, regulate and repair the furnace and heating system; that from September 29 until November 24, 1951, Davidson was in sole and exclusive control of repairing and maintaining the system; that during November it was functioning inadequately and complaint was made to Campbell, who agreed to thoroughly inspect, adjust, regulate and repair the plant; that Campbell's agent inspected the plant, collaborated with Davidson, and reported it to be in good operable condition but recommended a modification of the flue; that, on November 30 another explosion occurred, causing property damage in the amount of $6,789.88; that said damage was proximately caused by the negligence of Campbell and Davidson in having assembled, repaired, regulated and adjusted the oil burner with only one set of electrodes instead of two and that the single pair of electrodes were so adjusted as to fail to produce an ignition spark within the oil spray, so as to cause prompt ignition and combustion of fuel oil and vapors within the firing chamber, thereby permitting accumulation of combustible fuel which was liable to explode upon such delayed combustion; or that they negligently failed to discover and repair such dangerous conditions, or to report the plant to be in a dangerous condition.

In the third count plaintiff Duncan relied on grounds of negligence as stated in the second count and claimed damages in the amount of $12.65 expended for medical and hospital services, and $2,140 for per-

sonal injuries received as a result of the second explosion.

Campbell, for answer to first and second counts, denied any negligence on its part and pleaded that the damages were caused by a defective flue provided by the Board, and by the Board's careless and negligent operation of the plant. As to the third count, Campbell denied any negligence on its part and pleaded the negligence of the Board, as above stated, and the negligence of Duncan, as a defense.

Trial to a jury resulted in a verdict and judgment for the Board on the first count in the sum of $158, the exact amount paid to Campbell for services in repairing the furnace after the first explosion; for $940 on the second count, the exact amount of the cost of a new burner to replace the old one which was ruined in the second explosion; and in favor of Duncan, on the third count, in the amount of $127, the exact amount shown to have been expended by him for hospital and medical services.

Plaintiffs moved for new trial on the sole issue of damages, which motion was sustained. Campbell also filed motion for new trial on the ground that plaintiffs failed to make a submissible case, which motion was overruled. Campbell appealed from the above orders and judgment entered herein.

Plaintiffs concede that error was committed in the giving of Instruction P3, requiring reversal of the judgment, but insists that they made a submissible case. That is the sole issue for decision.

Dr. Medearis, plaintiffs' chief administrative officer, testified to the effect that the Board contracted with Campbell for construction and installation of a forced warm air, oil burning heating system, which was installed in their new three story $100,000 building, in July, 1949; that the plant was not actually placed in operation until in the fall; that the Board complained "a good deal" about the operation of the plant. Correspondence between the parties discloses that plaintiffs experienced much difficulty with the operation of the plant

through the winter of 1949–1950, the exact cause thereof being unknown to either Campbell or plaintiffs; that many controls and devices were removed and adjusted and plaintiffs were advised to procure Woodman to service the plant during the fall and winter of 1950–51.

Mr. Woodman testified to the effect that his company rendered service on the furnace January 10, 1950, no heat, nozzle screen and flame eye were changed; January 27, no heat, replaced relay in safety mechanism; calls on January 11, 12, 16, 20, 27 and 31, repairing motor; March 8 and 13, no heat, worked on relay and contacts; April 13 and 15, no heat, cleaned nozzle and replaced a part, operated system manually to keep going; service April 25; November 6, regulated clock; February 28, 1951, cleaned and adjusted nozzle, instructed janitor Duncan to keep furnace room window open so as to permit better draft, air had been coming back through draft regulator, causing a back draught through the flue and burner. He stated that specifications of the architect for installation required that the fan chamber be separated from the furnace by an airtight wall, which was not done until after the second explosion when witness caused a separate wall to be built around the furnace; that, prior thereto, the suction from the blower fan drew air through the fire chamber and burner, thereby killing the flue draft; that it would likely cause the furnace to soot and smoke, pulsate, vibrate, buck and snort and could result in burning the wires leading to the electrodes which furnish the firing spark; that it could cause carbonizing of the points so that no spark gap remained, thereby causing a spark behind insulators, thereby causing an explosion; that he recommended leaving the window open to provide air because he thought this condition may have had some connection with the explosion of January 8, 1951; that good practice required a permanent opening that could not be closed, such as the one mentioned in the plans of the architect; that if there had been an opening in the furnace room for fresh air the back draft would not have occurred;

that the points on the electrodes should be so adjusted as to be a spark gap between them, and should be advanced toward the oil spray cone so as to fire it without getting oil on the electrodes, which would carbonize them.

Mr. Brown, a heating man of long experience, testified that after the November 30, 1951, explosion, he removed the nozzle assembly, consisting of: dual nozzles through which oil came into the fire box, a single electrode to furnish a spark for firing the oil spray, and a deflector. He stated that the points of the electrode were too far apart for proper operation, too far advanced in front of the nozzles, and too close to the nozzles perpendicularly; that such adjustment could cause an explosion due to failure of ignition at the proper time, permitting an accumulation of fuel vapor which may explode upon a delayed ignition; that reverse draft resulting in sooting could cause a short and delayed ignition; that he made temporary repairs and placed the system in operation; that he used the same burner but put on one nozzle instead of two, in temporarily repairing it for operation after the explosion; that he delivered the nozzle assembly to Mr. Bemberg in the same condition it was in when removed from the furnace.

Mr. Bemberg, a graduate in engineering and architecture inspected the plant December 1, 1951. He stated that he examined the nozzle assembly and found the distance from the face of the nozzle to the tip of the electrode was ¾ inch but, according to the manufacturer's manual, it should have been ¼ inch; that the distance between the anode and cathode of the electrode was ⁹⁄₁₆ of an inch whereas, according to the manual it should have been ⁵⁄₁₆ of an inch; that the distance between the electrode and the body of the nozzle should have been greater than it was; that, in witness' opinion, the above-mentioned deviation from standard as prescribed by the manufacturer's manual in the setting and regulation of the electrodes caused the explosion of November 30, 1951; that the maladjustment of the oil burner nozzle assembly (which includes the electrodes) caused the explosion; that he

arrived at this opinion after a thorough examination of the heating system, and after considering various other factors which might have caused an explosion; that the manufacturer's recommendation as to adjustment of the nozzle assembly should be followed; that, from his examination of the apparatus it was his opinion that, no one had manually changed the adjustment after its removal from the furnace and prior to witness' examination.

Dell Duncan, the janitor, testified to the effect that Mr. Bradley, Campbell's man, worked on the furnace November 23 and that he removed the nozzle assembly and, in the presence of the witness, worked on it; that, so far as he knew, no one else worked on the furnace from that date until the explosion occurred November 30; that, after the first explosion, Mr. Woodman worked on the furnace, opened a window in the furnace room and ordered that it remain open; that it was, thereafter, kept open; that, on November 30, he was standing by the furnace when it "caught on" but did not start; that it had been running about ten minutes before; that the smoke rolled out; that he reached for the switch and the furnace exploded, injuring him and demolishing the furnace and furnace room.

■ Defendants challenge the sufficiency of the evidence to make a case on either count. In determining this issue we must follow the well known rule that all evidence favorable to plaintiff's theory must be accepted as true and all favorable inferences must be drawn therefrom; and if there is substantial evidence of defendant's actionable negligence, coming from but a single witness, and even though that witness be an "expert" witness, we will hold that a submissible case was made, if plaintiff is not guilty of contributory negligence as a matter of law. Gaddy v. Skelly Oil Company, Mo., 259 S.W.2d 844, 848.

■ With the above rule in mind, we think there is a lack of sufficient probative evidence upon which the jury could have found a verdict based on the specific negligence charged in the first count. The plant was installed in July, 1949, and was operated

during that fall. It was operated during the whole calendar year of 1950. The furnace exploded, the first time, January 8, 1951. True, there was something wrong with it for a long time prior to the explosion and it required much servicing and replacement of parts. However, the evidence does not pinpoint the cause of the explosion but, in that connection it is at best, vague and speculative. It is not such evidence as would justify submission of the issue of Campbell's negligence. Gaddy v. Skelly Oil Company, supra. Furthermore, there is some evidence tending to prove that the explosion may have resulted from a cause for which defendant is not liable. Waldron v. Skelly Oil Company, 363 Mo. 1146, 257 S.W.2d 615, 620. According to the record, Campbell's specific warranty expired some months before the explosion occurred and several servicemen thereafter worked on the system, servicemen not connected in any way with Campbell. What they did or failed to do is not clearly known. In no case could we say that there was substantial evidence upon which a charge of negligence based on some specific act or shortcoming of Campbell can be based.

The conditions which may have caused the second explosion are more clearly delineated by the evidence. Campbell sent its expert, Bradley, to inspect the furnace and to correct the conditions which were, at that time, causing it to give very unsatisfactory service. Bradley testified, for Campbell, to the effect that his first inspection and work was on November 15, 1951; that he adjusted the nozzle assembly, including the electrode; that Dell Duncan was not in the building that day; that the only thing he found that could have been causing the furnace to fail to produce heat was the adjustment of the electrode in the nozzle assembly; that after adjustment the burner operated properly; that, on November 23, he again inspected the furnace; that Duncan was present on that occasion; that he, Bradley, stuck his head into the fire box and saw that the electrodes were in the same position in which he had placed them; that the furnace was operating properly and he did nothing to it; that he did not take out the nozzle assembly; that he adjusted the electrodes, on the first trip, according to his experience and judgment, not according to the manufacturer's manual.

It will be remembered that Mr. Duncan testified to the effect that he was present on November 23 when Bradley removed the nozzle assembly from the furnace and worked on it; and both Bradley and Duncan stated that Duncan was not present on the occasion of Bradley's first inspection.

A jury could believe that Duncan was present and saw Bradley remove the nozzle assembly and work on it, on November 23, seven days before the explosion. Bradley admitted that he adjusted the electrodes, not according to the manufacturer's manual, but according to his own judgment. He also stated that maladjustment of the electrodes was all that he found which could have accounted for the failure of the burner to fire and produce heat. According to all of the testimony, no one else touched the burner from November 23 until after the explosion. Mr. Bemberg gave it as his opinion that maladjustment of the electrodes caused the explosion. The jury could reasonably have so found, and could also have found that Bradley so adjusted the electrodes. We hold that it was within their province to do so.

We rule that a submissible case was made on the second and third counts, but that none was made on the first count.

The judgment should be reversed and the cause remanded with directions to dismiss count one and, inasmuch as plaintiff concedes error in the submission of counts two and three, a new trial should be had on the merits on said counts.

BOUR, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with directions to dismiss the first count and that a new trial on all issues be had on counts two and three. All concur.