Humphrey R. CRADDOCK, V. Isabel Craddock and Humphrey R. Craddock, Administrator of the Estate of Julia Craddock, Deceased, Appellants,

v.

GREENBERG MERCANTILE, Inc., Charles Patterson and John S. Tompson, Respondents.

No. 45264.

Supreme Court of Missouri.
Division No. 2.

Jan. 14, 1957.

542

Curtis J. Quimby, Jefferson City, Latney Barnes, Mexico, for appellants.

Jackson A. Wright, Fry, Edwards & Wright, Mexico, for respondents Greenberg Mercantile, Inc. and Charles Patterson.

Hunter, Chamier & Motley, Moberly, for respondent, John S. Tompson.

EAGER, Presiding Judge.

In this action plaintiffs sought damages totalling $68,700 for the destruction of a building and its contents by fire which they claimed resulted from the negligence of defendants in the maintenance, repair and operation of an oil furnace in an adjoining building. The parties will be referred to as they appeared below, the appellants as plaintiffs, and the respondents as defendants. The trial resulted in a hung jury, but the court sustained the after-trial motions of all defendants for judgment in accordance with their motions filed at the close of all the evidence, thereby awarding judgment to the defendants. This the trial court may do. Section 510.290 RSMo 1949, V.A.M.S. Plaintiffs have appealed.

Defendant Greenberg Mercantile, Inc. was the exclusive occupant of, and in control of, the two-story building in which the fire started, and which adjoined the build-

ing of plaintiff Humphrey Craddock; the former building was commonly known as the "Brokerage" building; it was located on the east side of the square in Mexico, Missouri. Defendant Patterson was the manager of Greenberg Mercantile, Inc. Defendant Tompson had been in the heating and plumbing business in Mexico for over 12 years, and he had, shortly before the fire and at the request of the other defendants, serviced the furnace in the basement of the "Brokerage" building; that furnace is the primary source of the present controversy. Plaintiff Humphrey Craddock owned the building adjoining on the south and its principal contents, which were substantially destroyed in the same fire; the other two plaintiffs owned small amounts of personal property also located in that building. In their third amended petition plaintiffs charged negligence against defendants Greenberg Mercantile, Inc. and Patterson as follows: that they allowed the furnace to become and remain defective and unsafe, in that there was no adequate draft, that the oil burner "slobbered" or "dribbled" excess oil and permitted unignited oil to accumulate, and that inflammable material was stored nearby in the basement; and that, nevertheless, they continued to operate the furnace under such conditions. As to defendant Tompson, plaintiffs charged: that he was employed on and prior to January 19, 1952, to inspect and repair the furnace, that he then discovered that the draft was "probably" inadequate, that the oil burner "slobbered," that oil had accumulated in the bottom of the furnace, that sooting had occurred and ignition was impaired, and that oil had soaked into the wooden flooring; it was further charged that he did not discover the causes and details of these conditions, negligently failed to correct them, and negligently failed to give adequate warning of the defects, or to shut down the operation of the furnace, although he did warn the other defendants that the furnace should only be operated moderately and in the daytime, and that it should be moved to another location. It

was further alleged that defendants Greenberg and Patterson negligently disregarded such warnings as were given, and that all such combined negligence resulted in an explosion and the resulting fire. The answers, insofar as they concerned all questions of negligence, causation and damage, consisted of denials.

At about 2:00 a. m. on January 21, 1952, fire was discovered in the basement of the "Brokerage" building and promptly reported. That building was a two-story store building, approximately 21 feet wide, north and south. The depth of the building ran east and west, with the front facing the square and the rear on an alley. The basement was at the rear, consisting of a space extending approximately 24 feet, 4 inches, east and west, by 21 feet north and south. The Craddock building, adjoining on the south, had the same depth and approximately the same height; it was used as a retail store for the sale of school and office supplies and stationery. It contained two floors and a full basement, with an elevator at the rear, and a "penthouse" on the roof housing elevator equipment. Since it is substantially conceded that the fire started in the basement of the "Brokerage" building, it will be necessary to describe in more detail the premises and equipment. The basement floor was of wood; the floor above was supported by wooden 2 x 10 inch joists; the only door to the basement was from the alley, and it was located at the rear on the southeast corner. At a location a few feet from the rear wall, and a little more than 7 feet from the south wall, sat the oil-burning furnace on rows of bricks; the smoke-pipe from this furnace ran at an angle southwesterly to a chimney in the south wall, so that its total length was about 9 feet, rising a little as it neared the chimney. From this smoke-pipe a short "T" pipe protruded at right angles to the main pipe, and in a general northwesterly direction; this was located near the furnace. In the opening at the end of this "T" had been inserted a "barometric damper," which is the

particular source of much of the controversy here. This is a metallic object, having a frontal circular rim approximately 10 inches in diameter with a slight flange, and a depth of 1¼ inches, which permits it to slide into and be held in the open end of the "T" pipe by friction. Inside the circle of the rim is a flat metallic disc, so hinged that it may move to open or close; this, in turn, is fitted with counterweights which permit the aperture to be opened and closed as the existing draft in the smoke-pipe indicates. Two thin, flat wings extend to the rear from the frontal rim, completing the construction. The damper was held in place merely by friction, plus, perhaps, a slight elevation of the "T" pipe. The "T" pipe was located substantially in a line between the basement door and the northwest corner of the basement.

On January 16, 1952, Mr. Tompson was called by the other defendants to service the furnace in their basement; the particular complaint was of "no heat." At this point it is necessary to describe the furnace in more detail. Its four sides were rectangular, the outside walls being of steel; inside there was a steel casing, more or less cylindrical in shape; in the lower part was the separate combustion chamber of heavy stainless steel; the upper space was called the "heat exchanger"; it contained baffles and its outer wall was compressed into "fins" or corrugations to permit better heated air circulation. The burner itself was comprised of a motor, a fan, an oil pump and an oil pipeline, with suitable coverings; the fuel oil was pumped under pressure to a nozzle, which then sprayed it into the combustion chamber. Electrodes, located almost immediately in front of the nozzle, supposedly ignited the spray when it was started, and a conical or egg-shaped flame was thus blown into the combustion chamber, and, in turn, the heated air passed into the "heat exchanger" and on into the circulation. An ordinary thermostat on the floor above automatically effected an electrical connection and turned on the burner when needed. Just back of the furnace on

the smoke-pipe was located an electrically controlled "stack-switch" also described as a "protector relay"; this had two functions: (a) to allow a sufficient time between operations of the burner to permit the furnace to "purge," by preventing a reignition; and (b) to shut the burner off automatically if the oil spray did not ignite and produce a certain temperature within a given time (here 90 seconds according to most of the evidence) after the motor and pump were started. After such a shut-off the switch had to be reset manually. There was no evidence in the case that this switch was not in proper operating condition.

When Mr. Tompson examined the furnace, he found that it had been turned off by the stack-switch. By his evidence and that of two others (one an electrician who assisted him, and the other a man also engaged in the heating and plumbing business who observed part of the operations in question) the following facts were shown, all as a part of plaintiffs' case: the furnace was started and it was found that it was not firing well; the nozzle was found to be "dribbling" a little fuel oil when the burner shut off; there was perhaps a teacup full of oil in the bottom of the furnace, which was cleaned out; the nozzle was slightly encrusted and a new one, somewhat smaller and of the prescribed size, was substituted; the electrodes were cleaned, and the electric controls were checked by the electrician whom Mr. Tompson called; the furnace and the smoke-pipe were cleaned with a suction-type furnace cleaner, in which process the pipe was taken down and reassembled; the furnace and pipe were only normally sooty. Mr. Tompson spent all morning on this job and came back to observe the furnace and burner in the afternoon. When the job was completed the burner was, according to all three of these witnesses, operating satisfactorily, with a good flame and a sufficient draft, and it was coming on and shutting off properly, as indicated; these men testified that experienced observation is the method generally used in the field in such instances to deter-

mine the operating condition of the burner, without technical tests. Mr. Tompson testified that the services enumerated should have stopped the dribble of excess oil. He recommended to the defendant Patterson that the furnace be moved to a concrete base already in the basement, because: (a) the new location would furnish a safer base; (b) it would make the arrangement of the basement more convenient; and (c) the move would shorten the smoke-pipe and possibly give more draft. He also suggested that the furnace be operated moderately and in the daytime for a while, because there was oil on, or soaked into, the floor around the furnace, which he thought would evaporate in about 24 hours. The witnesses who saw the furnace operating at the conclusion of the repairs testified that the draft was then adequate. The damper and "stack-switch" appeared to be working normally at that time. On Saturday, January 19th, Mr. Tompson was called back by a complaint of "no heat"; he found that the thermostat was operating defectively, and he corrected this, but he also arranged to come back the next Monday and install a new one. When he left, the furnace was starting and stopping properly.

From observations made both before and after the fire it was shown that there was some "latticework" standing along the west wall of the basement. This consisted of wooden strips about 1½ inches wide made into frames, which had presumably been used in the store for some purpose. There was some rather ambiguous testimony about the possible presence of cardboard signs or paper of some kind, along with the wooden strips. The only witness who testified that he saw the materials before the fire was the fire chief; he said there was "foil" paper which would not blaze when fired, but would merely curl up.

When the firemen reached the scene they found very dense smoke in the basement of the "Brokerage" building, and could not enter. They threw water from two hoses (2½ and 1½ inches in diameter, respectively) into the basement from the alley door. Estimates of the pressure from these hoses varied, but there was evidence that it would knock a man down. After a short time flames broke out in the basement, and water was thrown from the hoses all over the basement, but particularly across the furnace pipe and "T" to the northwest corner, where the main fire was located. In a short time the flames burned through the ceiling in that corner, burning completely through the joists, and that part of the first floor collapsed, dropping sundry clothing, dress racks, rags, etc. into the basement, mostly unburned. The flames, thus fed with a draft, extended quickly to the second floor and the roof, from which they fired the penthouse on the Craddock building; that building, in turn, was substantially destroyed, along with its contents. According to some evidence water was poured on the fire for 56 hours. Subsequently this was pumped out of the basements.

About Wednesday or Thursday, January 23rd or 24th, Mr. Humphrey Craddock entered the "Brokerage" basement to see what he could learn. The basement door was open and, of course, he could not tell, then or later, whether others may have entered. He found, as everyone did, that the heavy burning was in the northwest corner of the basement, where the joists and floor had collapsed; this covered particularly an area of perhaps 6–8 feet by 12 feet. Mr. Craddock then noticed that the end of the "T" pipe was open, but he did not see the barometric damper. The basement was very soggy, and the floor was more or less covered with debris. On the next Sunday, almost a week after the fire, Mr. Craddock again inspected the basement, with his son George and another person. He and his son testified that they then saw the damper lying on the floor close to the west wall and near the middle of the wall, north and south; a photograph was taken of it in that position, the fire chief was called, and after the latter saw it, it was removed.

The damper was produced and introduced as an exhibit at the trial, intact, and in substantially the same condition as when in the smoke-pipe. It was found after the fire that the furnace was scorched or blistered, as were other areas of the basement, but all witnesses testified that the furnace showed no evidence of an explosion, and some of these persons had seen exploded furnaces; they testified that usually the door would be off, or the casing of the furnace spread, and the smoke-pipe knocked down. The electric wiring in the basement was in flexible cables which had been loosened in places, but the wiring was apparently intact.

In August, 1952, various representatives of the plaintiffs and defendants met and inspected the basement and its contents. This group included an engineer representing each side. Mr. Bayard Brick, the engineer representing plaintiffs, with the consent of all involved, removed the burner assembly and the controls and took some of the fuel oil from the tank. A little later he set up the burner near his laboratory in St. Louis, but outdoors, and operated it in the presence of various persons, including one or more engineers who testified for the defendants. Mr. Brick was a consulting engineer from St. Louis, and his qualifications were not questioned. He testified that the burner and all its parts worked satisfactorily in his test except that it "dribbled" fuel oil when the motor was stopping, this varying from .2 to 1.6 grams. His theory, and his opinion, was that an explosion of the nature of a "puff" or "flash" had occurred in the upper part of the furnace, due to such dribbling, and that the explosion had blown the damper, along with fire or flaming soot, to the position where it was found, thus igniting "combustible material" there. He drew this conclusion entirely from the finding of the damper as noted above, plus the fact that the nozzle "dribbled" in his experiment; he also said that he "eliminated" other possible causes. He testified that 1.6 grams of oil could produce from 1 to 2 cubic feet of explosive vapor. He, therefore, assumed, or theorized, that such an amount of oil had vaporized, without burning in the combustion chamber, that the fire came on again almost immediately due to "cold or draft" on the thermostat and before the gas had purged through the smoke-pipe, presumably due to insufficiency of the draft, and that this vapor was ignited with the result already stated. He thought that the pressure of the "flash" went up the smoke-pipe as the line of least resistance, but that there was enough "back-pressure" to blow out the damper. He testified that there was no visible evidence of an explosion in or on the furnace, that the smoke-pipe was intact, and that the damper had not been damaged; he further said that if the damper had been removed in some other manner his conclusion would be different. He testified that he did not think the water from the fire hoses could knock the damper out, although the fire chief, testifying for plaintiffs, thought it could have, and all the firemen agreed that there was a very considerable water pressure. Mr. Brick thought that, so far as he was concerned, he had eliminated other causes of the fire, i. e., electricity and other types of gas. He testified that there were magnetic safety valves on the market which would prevent the "dribbling" from the nozzle, and thought that these were in use on perhaps 25% of all oil furnaces, old and new. He further testified: that such "flashes" do not occur "very often," and that it was impossible to anticipate such a flash at any particular time, for a furnace usually purges itself of any excess vapor through the smoke-pipe; that in his opinion there was not enough combustible gas here to blow up the furnace; that the major burned area was "pretty much" in line with the direction of the "T" pipe, and that he sawed charred and unconsumed latticework along the west basement wall.

Two of plaintiffs' witnesses testified that ordinarily the hot combustion chamber would burn any excess dribble of fuel oil; Mr. Brick, and perhaps one other, testi-

fied that it would usually vaporize and purge, without igniting. None of plaintiffs' witnesses except Mr. Brick saw anything which, to him, indicated an explosion. There was evidence that there is some "dribble" in any oil burner; all the witnesses seemed to agree that there was no substantial burning around the furnace, and that the oil which had soaked into the floor there had no part in causing or aggravating the fire.

Vital parts of the testimony of Mr. Brick were contradicted by defendants' experts, but we need not consider that evidence here. We shall consider only the evidence produced on behalf of plaintiffs; we see nothing in defendants' evidence which would aid plaintiffs substantially. We have examined and considered the many photographs and illustrations which were offered as exhibits; it is impossible here to discuss them in detail. There was much evidence of the value of the properties involved and of the extent of destruction, but, under the circumstances, all this has become immaterial.

██ The sole question here is whether the trial court was correct in ruling that plaintiffs had not made a submissible case. This question, of course, is subdivided into two parts: (a) was there substantial evidence of negligence? and, (b) was there substantial evidence that the negligence, if any, caused the fire? On both of these subdivisions plaintiffs must rely upon the testimony of Mr. Brick, for we fail to see how the other evidence could establish a prima facie case on either. We doubt seriously that any submissible case was made on the issue of negligence as to any defendant, but we need not rule that question, for we have decided that no submissible case was made on the question of causation. We proceed to this consideration, recognizing that plaintiffs must be given the benefit of all reasonable inferences arising from the factual evidence and from the circumstances shown. Boyd

v. Terminal R. Ass'n of St. Louis, Mo., 289 S.W.2d 33; and we recognize also, as urged by counsel, that the precise injury complained of need not have been foreseen if, in fact, the injury was the natural and probable consequence of an act or omission of defendants. Boyd v. Terminal R. Ass'n, supra; Gaines v. Property Servicing Co., Mo., 276 S.W.2d 169. But the latter proposition is not controlling here; there must always be substantial evidence that the thing which actually occurred, foreseen or not, resulted from, or was at least contributed to by, the act or acts of defendant. It is that element which we deem to be missing here.

██ The mere occurrence of a fire does not prove, or raise a presumption of, negligence. Kansas City Stock Yards Co. v. A. Reich & Sons, Mo., 250 S.W.2d 692; Hendricks v. Weaver, Mo., 183 S.W.2d 74. Likewise, the mere occurrence of a fire raises no presumption as to its cause, generally. Consequently, the burden was upon the plaintiffs here to prove the specific negligence alleged, and, in line with their very specific allegations, to prove that defendants' acts caused *an explosion* in the furnace, which, in turn, blew out the damper along with "flame and flaming materials" and set fire to the building. There was no contention here that the furnace caused the fire otherwise than by an explosion. And there must be substantial evidence on both negligence and causation to make a submissible case. No witness of plaintiffs testified to anything which, to him, indicated an explosion of any kind except the engineer, Brick. These witnesses included two furnace men and an electrician, and their combined testimony tended strongly to negative any explosion. Counsel urge, and properly, that the testimony of one witness, though an expert, may constitute substantial evidence justifying a submission. Executive Board of Missouri Baptist General Ass'n v. Campbell, Mo.App., 275 S.W.2d 388; Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d

844, 849. But we are immediately confronted with the rule, announced so pointedly in the Gaddy case, supra, that: " * * The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force and 'The question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for this court.' Hall v. Mercantile Trust Co., 332 Mo. 802, 820, 59 S.W.2d 664, 672; Ambruster v. Levitt Realty & Inv. Co., 341 Mo. 364, 374, 107 S.W.2d 74." We do not think that the factual basis of Mr. Brick's opinions measures up to these standards. Of course, an expert's opinion is in the nature of a conclusion of fact, but it must have a substantial basis in the facts actually established. The opinion of the expert cannot be invoked to supply the facts, 20 Am.Jur., Evidence, § 787, p. 661. Here the principal fact established from which Brick proceeded, was that the damper was found near the west wall of the basement, 17 feet from the furnace, nearly a week after the fire. From this single fact, plus his own test or experiment, he assumed and concluded: (1) that the nozzle of the oil burner was dribbling at the time in question, four days after Tompson serviced the furnace and seven months before Brick saw it; (2) that due to cold or draft on the thermostat heat was again called for almost immediately after the burner had shut off and dribbled; (3) that .2 to 1.6 grams of oil which dribbled formed an explosive vapor, and had not yet "purged," as it had always done before, presumably due to insufficient draft; (4) that the flame of the furnace coming on again exploded this vapor and blew out the damper with flame; (5) that "combustible material" was present along the west wall and was thus ignited. We have determined that these conclusions were entirely too tenuous and we are constrained to class them as conjectures. The witness actually started with an assumption that the damper was blown out by an explosion, and worked back from that assumption. In other explosion cases there was positive testimony that a violent explosion did occur, definitely causing the damage complained of. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Executive Board of Missouri Baptist General Ass'n v. Campbell, supra, 275 S.W.2d 388. The question at issue in those cases was the proof of negligence. Here we start with the assumption of an explosion; ordinarily a conclusion or unproven assumption is not a proper basis in fact for an expert opinion. Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 142 S.W.2d 455, 463, 129 A.L.R. 829. To start with an assumption or conclusion that an explosion occurred, and then to give expert opinion as to its cause and mechanics, is almost to lift one's self by his own bootstraps. We repeat, the only fact shown in that connection was that the damper was *out,* days later. In that same connection we must recognize the other possible ways in which it could have been removed; it could have been taken out, before or after the fire, by almost anyone, through curiosity or otherwise; it could, according to substantial evidence, have been knocked out by the pressure of the water passing over and around it; and perhaps it could have been removed in one of still other ways. If the cause of an injury is left to speculation and conjecture, when sound reasoning does not point to the liability of the defendants to the exclusion of other causes, there may be no recovery. Panke v. Shannon, 357 Mo. 1195, 212 S.W.2d 792.

■ We feel also that Mr. Brick made at least one other unwarranted assumption, which was apparently essential to his conclusions, namely, that the draft of the furnace was insufficient to purge the explosive mixture which he thought had formed in the furnace. The three experienced workmen who were present when the furnace was repaired all testified, in

substance, that it was then operating satisfactorily and that the nature of the flame indicated a satisfactory and sufficient draft. This testimony was uncontradicted. We do not consider that the recommendation of Mr. Tompson that the furnace be moved to another location constituted a contradiction; there were several reasons for that recommendation, one of which was that with a shorter smoke-pipe the draft might be somewhat better; from his testimony that reason appears to have been rather incidental. But in any event, the positive testimony of three witnesses was that the draft was sufficient as it then was, and an expert witness may not assume the contrary. Plaintiffs are not bound by the testimony of any one of their witnesses, if such testimony is contradicted, but they are bound by the uncontradicted testimony of their own witnesses. Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W.2d 589; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628. It may well be that other unwarranted assumptions were made, as, for instance, that the nozzle was still "dribbling" at the time of the fire, and that the material along the wall was "combustible"; however, enough has been said to preclude a detailed discussion of these subjects.

■■■■ It is not our function to weigh the evidence, but it is our duty to determine whether there was substantial evidence to support a submission. Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 848. And this is a matter of law. Having determined that there was not such, we hold that the trial court was correct in sustaining the after-trial motions of the defendants for judgment. So holding, the judgment herein will be, and it is affirmed.

STORCKMAN, J., and BROADDUS, Special Judge, concur.

LEEDY, J., not sitting.