Roxie Smith SCHROCK, Appellant,

v.

ESTATE of C. H. LAWRENCE, deceased, Respondent.

No. 46922.

Supreme Court of Missouri,

Division No. 1.

Sept. 14, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 12, 1959.

Russell N. Pickett, Eugene E. Andereck, Phil Hauck, Pickett, Andereck & Hauck, Trenton, for appellant.

M. E. Montgomery, Milan, for respondent.

COIL, Commissioner.

On August 22, 1956, plaintiff below, Roxie Schrock, filed her demand in the Probate Court of Sullivan County against the estate of Charles H. Lawrence, deceased, claiming $17,950 ($5.00 per day for 3,590 days) for room and board and for nursing care furnished deceased. On October 31, 1957, the probate court transferred the claim to the circuit court, we assume under the provisions of Section 473.420, subd. 2 RSMo 1949, V.A.M.S. In any event, a jury trial resulted in a verdict and judgment for plaintiff in the amount of $1,500. Plaintiff has appealed from that judgment on the ground that it is grossly inadequate and contends that the trial court abused its discretion in overruling her motion for new trial which contained the specification that the verdict was inadequate.

■ The trial court, in overruling plaintiff's motion for new trial on the ground of inadequacy of verdict, weighed the evidence and determined that the verdict was not against the weight of the evidence. We shall not weigh the evidence but will determine only whether the trial court abused its discretion in overruling plaintiff's new trial assignment that the verdict was inadequate. We examine the record to ascertain whether there was substantial evidence to support

the action of the trial court when the evidence is viewed favorably to the verdict and the trial court's approval of it. Roush v. Alkire Truck Lines, Mo., 245 S.W.2d 8, 10 [1] [2] [3]; Waller v. Oliver, Mo., 296 S.W.2d 44, 49 [7, 8]; Combs v. Combs, Mo., 284 S.W.2d 423, 427 [8].

Plaintiff's evidence was that C. H. Lawrence, after the death of his second wife, entered into this agreement with plaintiff:

"This Agreement made and entered into this 15th day of December, 1946, by and between C. H. Lawrence of Milan, Missouri, herein called the First Party and Roxie Smith of Green City, Missouri, herein called the Second Party Witnesseth:

"In consideration of the furnishing of board, room and services including personal and possible nursing commencing on the date of this instrument and terminating on the death of the first party unless previously terminated either by mutual agreement or act of the parties to be done and performed on behalf of the first party by the second party said first party does agree to pay and compensate the second party for all such services rendered and performed at a rate and price to be set and determined by a Court of competent jurisdiction at the termination thereof and no amount to be due and payable to the second party until the death of the first party unless this agreement be terminated, abrogated or otherwise fulfilled or rescinded it being the intention of the first party that payment for such services rendered and to be rendered shall be by appropriate demand against the estate of the first party and if such services and duties are performed by the second party the first party acknowledges himself, his heirs and assigns indebted to the second party for the fair and reasonable value thereof.

"And the said second party undertakes and agrees so to perform and in all things to do and execute the act of providing board and room, personal care and nursing and any and all other acts and things necessary as a contribution toward the satisfac-

tion and comfort of said first party both in sickness and health.

"In Witness Whereof the said parties have hereunto set their hands this the 15th day of December, 1946.

"(Signed) C. H. Laurence
_____
C. H. Lawrence, First Party

"(Signed) Roxie Smith
_____
Roxie Smith, Second Party"

About the date of that agreement, Mr. Lawrence moved into the home of plaintiff and her husband who, at that time, was Roy Smith (he died in 1955 and plaintiff thereafter married her present husband, Mr. Schrock), and lived there continuously for almost ten years until his death in 1956 at the age of eighty-eight. The agreement had been prepared at Mr. Lawrence's request by his lawyer, the present executor and the proper party defendant in the present suit, although the suit was in reality defended by two heirs of C. H. Lawrence. About nine years later that same lawyer (present executor) drew Mr. Lawrence's will. Prior to its preparation Mr. Lawrence said that plaintiff had taken good care of him and that "he wanted her provided for by the agreement as well as naming her otherwise in this instrument [will]" (bracketed insert ours), and thereafter the lawyer prepared paragraph 9 of the will, which was: "I give, devise and bequeath the remaining undivided one-fifth share in and to all of my property, whatsoever and wheresoever, to Roxie Smith of Green City, Missouri, to have and to hold, to use and to enjoy and to dispose of absolutely, in consideration of and gratitude for the kindness and care she has given me over the last years of my life and it is my intention and direction *that she receive said share in addition to any and all other benefits provided for by gift, contract or otherwise*." (Emphasis supplied.) By Article Fourth he gave plaintiff certain household and kitchen furniture. The rest of his estate went to his children and

grandchildren. The will had been admitted to probate and its validity had not been questioned.

Testator's lawyer further testified that he had visited Mr. Lawrence during the ten years he had lived in plaintiff's home and that testator had visited the witness in his law office and that Mr. Lawrence had said "he was happy and satisfied in the home and contented to live there the remainder of his days," and that he had a clean room in a well-kept house.

Dr. T. R. McArtor testified that he had known Mr. Lawrence for the ten years immediately preceding his death and that he had examined and treated him up to one and one-half or two years prior to his death; that during the time he treated him, Mr. Lawrence suffered from arteriosclerosis, a perforated bladder which resulted in hemorrhaging and made it necessary to catheterize and to irrigate his bladder quite often, and that he also suffered from a possible carcinoma of the prostate gland. Doctor McArtor said he had instructed the plaintiff in the use of the catheter and that she catheterized Mr. Lawrence a few times in his presence; that there were other doctors also treating Mr. Lawrence during the time he was; and that his total bill for services was about $600 to $700. He said that deceased drove a car and was usually accompanied by plaintiff when he came to the clinic for treatment. He had prescribed hospitalization for Mr. Lawrence but it had been refused.

Dr. Robert Smith, an osteopathic physician, testified that he had known C. H. Lawrence during the time he lived in plaintiff's home; that he had treated him from 1947 until the time of his death; that Mr. Lawrence suffered from a chronic infection in the prostate gland, hardening of the arteries which had affected his heart, and "colon trouble." The doctor said the living conditions in plaintiff's home were good; that Mr. Lawrence had to be catheterized and irrigated frequently; and Doctor

Smith estimated that Mr. Lawrence was bedfast about one half the time during the 9-year period that he treated him. He testified that he prescribed a special diet for Mr. Lawrence which plaintiff carried out; that he had seen her wash his clothes, catheterize him, irrigate his bladder, give him hypodermics, bathe him, and that he thought that during the times he was confined to bed that plaintiff's services were worth from $5.00 to $10 per day. He said that his medical charges had averaged $200 to $250 per year. He said that he had prescribed hospitalization in 1954 when Mr. Lawrence had a severe hemorrhage from his bladder and needed a blood transfusion; that he thereafter recommended hospitalization but decedent refused; that decedent was bedfast for one month immediately prior to his death; that there were periods in 1954 when plaintiff had to be with him day and night; and that decedent was able to drive his car at times.

L. C. Hoover of Milan testified that he had been a hospital administrator from 1953 to 1957; that during that time Mr. Lawrence entered the hospital for a blood transfusion and that he requested that plaintiff remain with him so she, rather than the regular nurses, could catheterize him and irrigate his bladder, and that permission had been granted. Mr. Hoover said that Mr. Lawrence was a sick man and that plaintiff had furnished him a good comfortable home.

Various of plaintiff's neighbors testified that they had visited Mr. Lawrence while he was a resident in plaintiff's home and testified to these facts: that Mr. Lawrence could not have asked for a better home; that they had observed plaintiff doing his laundry, administering hypodermics, bathing him, shaving him, cutting his hair, changing his bed and clothing, and waiting on him day and night; that deceased had remarked how lucky he was to have a good place to live; that plaintiff gave Mr. Lawrence a good home and took good care of him; that he had said it was a nice home and that he was going to stay there as long as he lived; and that he had stated that plaintiff gave him the best of care and that he expected to leave her enough when he died so that she would not have to work the rest of her life.

A lady who had taken care of old and sick people in Sullivan County thought the reasonable value of services performed by plaintiff when Mr. Lawrence was bedfast, including board, was $6.00 to $8.00 per day.

Mr. Lawrence's grandson testified on behalf of plaintiff that he had visited his grandfather while he was in plaintiff's home; that Mr. Lawrence had stayed there from December 15, 1946, until he died; that his grandfather was satisfied with the type of care he was getting; that at times he was ill and at times he was all right.

We now review defendant's evidence.

Plaintiff bought a new car in November, 1956 and traded in a 1950 Ford the title to which was in plaintiff's name.

The cashier of the First National Bank of Milan, at which Mr. Lawrence had done business for the last 37 or 38 years of his life, testified that deceased had maintained a fairly active checking account in that bank. The witness had gone back to 1952 and obtained from the photostatic copies of the checks Mr. Lawrence had written the names of the payees and had noted those names on the ledger sheets reflecting the Lawrence account. Those notations read into evidence indicated from November 1952 to February 1954 Mr. Lawrence had given plaintiff six separate checks in varying amounts totaling $560; that from December 1952 to May 1956 there had been fourteen cash withdrawals by deceased in various amounts ranging from $10 to $500, except one in March 1956 in the amount of $5,000; that six checks totaling $181.46 were for lumber; that sixteen checks payable to Elvin Rouse for fuel oil totaled $197.53; and that plaintiff wrote no checks on Mr. Lawrence's account. The witness also testified that Mr. Lawrence received

a monthly pension check from the government for $60 for a time and later for $84, and that Mr. Lawrence invariably cashed rather than deposited those checks. While the witness was of the opinion that there were some differences in the signatures of Mr. Lawrence on the will and the contract, he nevertheless was of the opinion that both were the signatures of Mr. Lawrence

John Cooper testified that at some time during the 10-year period Mr. Lawrence rented a barn from him and that Lawrence and plaintiff's husband, Roy Smith, fed hogs; that Mr. Lawrence was active in driving his car; that plaintiff went with him on various trips; and that she provided him a good home.

Sylvia Search said that Mr. Lawrence frequently went to his farm but that sometimes he would not be there for a few weeks; that sometimes plaintiff was with him and sometimes plaintiff's husband; that she had seen them go fishing; that he drove his car; that she sold them cream and sometimes plaintiff or her husband paid for it and sometimes Mr. Lawrence paid for it; that she had seen Mr. Lawrence give plaintiff $10 with which to buy sugar on one occasion; that during the time Mr. Lawrence was operating two farms.

Mr. Rouse, in the oil business, said that he delivered fuel oil to plaintiff's home; that when plaintiff or her husband were not at home Mr. Lawrence would pay for the oil, and that Mr. Lawrence bought gas for his car.

Walter Morris, filling station operator in Green City, said that Mr. Lawrence regularly bought gas from him and that Mr. Lawrence was driving his car until a short time before his death; sometimes plaintiff would be with him and sometimes plaintiff's husband.

Plaintiff in her verdict-directing instruction required the jury to find that Mr. Lawrence had moved into her home on December 15, 1946 and lived there for 3,590 days until his death on October 15, 1956; that during that time plaintiff furnished him room, board, and services including nursing care; that prior thereto Mr. Lawrence had promised and agreed to pay plaintiff therefor; and that plaintiff had not been paid. Instruction 3 authorized the jury, in the event it found for plaintiff, to award her such sum as the jury found and believed from the evidence "to be the fair and reasonable value of the services, if any, rendered by her to the deceased, C. H. Lawrence, for which she has not been compensated."

Defendant, by instruction 4, directed that if the jury found that plaintiff had been paid for the services and materials furnished, then its verdict would be for the defendant; and if she had not been previously paid or adequately compensated, then it was to award her an amount representing a fair and reasonable charge, taking into account all the existing circumstances.

It is at once apparent that the jury, by its verdict, found the facts to be that deceased, C. H. Lawrence, had been a resident in plaintiff's home and had promised to pay her for the room, board, and care which plaintiff furnished. Indeed, while there was no formal admission by defendant, there was no controversy about the fact that the written agreement had been executed, about the fact that deceased lived in plaintiff's home, or about the fact that plaintiff did furnish him room, board, and care. There were no pleadings and thus no clearly defined issues, but both parties submitted the case on the theory that the only matter in dispute was whether and to what extent plaintiff had been paid and, if not, what constituted fair and reasonable compensation under all the evidence.

The instructions and the jury argument on behalf of the estate apparently were based on the premise that the total of the checks heretofore mentioned amounted to full or partial compensation for the services rendered by plaintiff. We are of

the view, however, that there was no substantial evidence that any amounts of money, automobiles, or other property, given by Mr. Lawrence to plaintiff, or money paid by him on behalf of plaintiff or plaintiff and her husband or for their direct or indirect benefit, constituted full or partial payment for the board, room, and care which Mr. Lawrence received. The facts, standing alone, that Mr. Lawrence made checks payable to plaintiff, that he paid for lumber which may have been used in the repair of plaintiff's home, that he paid for fuel oil used to heat plaintiff's home, that he made some cash withdrawals, and that he may have given plaintiff a 1950 Ford, or when those facts are viewed in the light of the language of the undisputed will in which deceased specifically provided that the legacy provided in the will was to be in addition "to any and all other benefits by gift, contract, or otherwise," did not constitute substantial evidence which would reasonably support a finding that plaintiff had been paid any amount for the room, board, and care which she furnished Mr. Lawrence. We are fully cognizant of the fact that the jury did not need to believe plaintiff's evidence as to the extent and nature of the care rendered, e. g., the jury did not have to believe the doctor's testimony that Mr. Lawrence was bedfast for one half of the 10-year period; and the jury reasonably might have found that during some portion of the time Mr. Lawrence was active and needed no nursing care. The facts, however, that he did spend almost ten years (3,590 days) in plaintiff's home and had his meals there and did receive some care were undisputed and, as noted, tacitly conceded. The $1,500 verdict amounts to compensation at the rate of 45 cents per day. It is a matter of common knowledge that 45 cents a day is a grossly inadequate amount to compensate for one's daily room and board during the time in question, to say nothing of whatever other care may have been furnished.

Inasmuch as there was no substantial evidence of any payment for the board, room, and care furnished decedent, the amount awarded by the jury was grossly inadequate to compensate plaintiff. It follows that there was no substantial evidence to support the action of the trial court when the evidence is viewed favorably to the verdict and the trial court's approval of it, and the conclusion is compelled that the trial court abused its discretion in overruling plaintiff's new trial assignment that the jury's verdict was inadequate.

The judgment is reversed and the case remanded for a new trial.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.