Virginia STAHLHEBER, Plaintiff-Respondent,
and
Robert Stahlheber, Plaintiff-Appellant-Respondent,

v.

AMERICAN CYANAMID COMPANY, Defendant-Appellant-Respondent.

No. 54236.

Supreme Court of Missouri, Division No. 1.

Feb. 9, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied March 9, 1970.

**50**

Sommers & Montrey, Don B. Sommers, St. Louis, for plaintiff-appellant.

Robertson, De Voto, Wieland & Lange, L. A. Robertson, Morton K. Lange, St. Louis, for defendant-appellant.

WELBORN, Commissioner.

Action for damages for personal injuries sustained by plaintiff Virginia Stahlheber, who alleged that she became afflicted with poliomyelitis from taking live virus polio vaccine, manufactured by Lederle Laboratories Division of defendant American Cyanamid Company. She sought damages of $450,000. Her husband, Robert Stahlheber, sought damages of $250,000 for the injuries sustained by his wife. A jury returned a verdict in favor of Virginia Stahlheber for $130,000 and in favor of Robert for $20,000. The defendant appeals from the judgment in favor of both plaintiffs. Plaintiff Robert Stahlheber appeals on the ground that the judgment in his favor is inadequate.

The case was tried on the theory that the defendant negligently failed to warn persons receiving its vaccine of the possibility that adult persons doing so might become afflicted with poliomyelitis.

Poliomyelitis is caused by a virus. Three types of virus, known as Type 1, Type 2 and Type 3, have been identified as causative agents. In 1949, Doctor Enders at Harvard discovered a process for tissue culture of polio virus. This discovery led to the development of vaccine for use against the disease. The first vaccine was produced by Doctor Salk and came into use around 1955. It involved the use of the killed virus, injected into persons.

Around 1955, Doctor Sabin developed a method for production of a live attenuated

virus for use as a polio vaccine. An attenuated virus is one which has, through laboratory procedures, been rendered incapable, to the degree at which it is attenuated, of producing disease. The virus employed in live polio vaccine is weakened so that it will not produce the disease in the person receiving it but it will cause the production of antibodies which will thereafter resist the attack by a wild or virulent virus.

Originally, an oral live virus vaccine was administered separately for each of the three types of polio virus. Lederle was licensed by the Surgeon General of the United States for production of the separate or monovalent vaccine on March 27, 1962. On June 25, 1963, Lederle received a license for a trivalent vaccine, or one in which all three types of the attenuated live polio virus were used. The product was produced and sold by Lederle under the trade name "Trivalent Orimune."

No charge is here made that the product involved in this case was defective and we need not detail the evidence of defendant of the extensive precautions involved in the licensing and production of the product. Such evidence, in any event, would not be binding upon the plaintiffs.

City-County Charities, Inc., sponsored mass polio immunization programs in St. Louis and St. Louis County. It purchased Trivalent Orimune from Lederle and sponsored its use in "feedings" on November 24, 1963, January 26, 1964, and April 5, 1964.

One of the "feeding" stations was at the Crestwood School. Mrs. Stahlheber then 41 years of age, went to the school with her son on April 5, 1964, and took the dosage of Trivalent Orimune there provided for her.

Mrs. Stahlheber had no physical disability at that time except for a rectal abscess which had been discovered when she was hospitalized in December, 1963. The doctor told her that an operation would be required sometime in the future for repair of a fistula.

On April 16, Mrs. Stahlheber noticed a stiffness on the right side of her neck. She went out to lunch with a neighbor the next day, but her neck continued to bother her and the next day she noticed pains in her lower back. She did not feel well over the weekend and, at her husband's insistence, called her doctor on Monday to make arrangements to have the fistula taken care of.

Her physician, Doctor Passanante, told her to come to the Missouri Pacific Hospital on April 22. She did so and was admitted around noon on that date. Except for the cause of her admission, physical examination upon admission was negative. On the first night, she complained to the nurse of severe back pain. She was given a sedative, but it did not relieve her pain. Sometime after midnight she was examined by a doctor who tested the motion of her legs and suggested the possibility of a low back sprain.

Operative repair of the fistula was performed by Doctor Passanante on the morning of April 23. When Mrs. Stahlheber returned to her room from surgery, pain in her back and legs became worse. She was able to walk to the bathroom in the afternoon, but the pain continued to become more severe in her back. Sometime after midnight she noticed that she was unable to move her right leg. Doctor Passanante examined Mrs. Stahlheber early on the morning of the 24th. He found "only minimal motor function of extensor and flexor groups, right lower extremity. Absent patellar reflex and very minimal ankle reflex * * * No absence of sensation noted." Doctor Passanante ordered an immediate neurosurgical consultation. Mrs. Stahlheber was examined by Doctor Kendig, a neurosurgeon, who called in Doctor Gitt, a neurologist and psychiatrist. Doctor Gitt examined her, found paralysis of the right leg and a moderate weakness in all muscular movements of the left leg.

His tentative diagnosis at that time was meningo-encephalomyelitis. Dr. George Hawkins also examined Mrs. Stahlheber on the 24th and made a note in her hospital record: "Think this is probably virus—? Poliomyelitis."

Mrs. Stahlheber's left leg became weaker and eventually both legs and both arms became involved. She could barely move her right finger, could move her left arm slightly, could move her left middle toe and could turn her head to the left.

At Doctor Gitt's suggestion, Mrs. Stahlheber was moved to Barnes Hospital on April 27 so that a respirator would be available should her breathing become involved. The discharge note states that Mrs. Stahlheber was transferred to Barnes "with (?) signs of Landry's paralysis (?)." The discharge diagnosis at Missouri Pacific Hospital was: "Landry's paralysis, undetermined."

Mrs. Stahlheber's paralysis reached its peak about five days after her admission to Barnes. At that time she had lost the use of her right arm completely, could not turn her head and had no control of her bladder or bowel functions. She suffered excruciating pain, "like hot corkscrews in my legs and my back and my neck."

Mrs. Stahlheber was taken out of isolation at Barnes after five to seven days. Physical therapy treatment began. Originally, the treatment was in her hospital room. Later, she was taken on her bed to the physical therapy treatment area. Eventually, she went to physical therapy in a wheel chair in which she was tied with a towel.

Mrs. Stahlheber was discharged from Barnes on July 17, 1964. At that time she had no function in the muscles of her legs. Some function with weakness had returned to her arms and a slow gain in strength in those muscles was noted. She had regained bowel and bladder control.

The discharge diagnosis at Barnes was "Post Infectious Myeloradiculopathy."

After her discharge from the hospital, she returned for daily physical therapy for several months. Those treatments were reduced to twice a week, then once a month, and, at time of trial, once every four months.

At the time of trial, the condition of her left arm was "pretty good." Her right arm was bad; she could not sit up without support; her legs were useless. The only use or motion of her legs was ability to wiggle the left little toe. She was a bedpan patient. She was able, with the aid of a trapeze, to pull herself to a sitting position in her bed, but had to be assisted from the bed to a wheel chair.

On American Cyanamid's appeal, the first contention of appellant which we consider is that no submissible case was made because plaintiffs failed to produce substantial evidence that Mrs. Stahlheber was ever affected with poliomyelitis, Types 1, 2 or 3, or that there was any causal connection between the taking of defendant's vaccine and the disease which struck Mrs. Stahlheber.

Appellant's argument on this point rather well ignores the oftrepeated, elementary rule that on such a contention the evidence must be considered in the light most favorable to the successful party, disregarding evidence of the losing party except insofar as it might aid the successful party. In fact, the argument ignores appellant's statement of the case which, because it clearly demonstrates the substantial nature of plaintiffs' evidence on the nature and cause of Mrs. Stahlheber's illness, we adopt and here set out at length (omitting transcript references):

"Five doctors testified on behalf of plaintiff, and clinically diagnosed plaintiff's illness as poliomyelitis, and expressed the belief that it was caused by the ingestion of the oral polio vaccine manufactured by the defendant.

"Dr. Richard Maxwell, the former Director of the Isolation Hospital in St. Louis

for ten years prior to and until 1950, who had seen over 600 polio patients during that time, testified that he had examined Mrs. Stahlheber and had also reviewed the hospital records and found what he considered to be a residual of poliomyelitis. He said he thought it was reasonably probable that she had had poliomyelitis and that it was reasonably probable that there was a causal connection between the oral vaccine and the development of the disease. He said that the virology work-up contained in the hospital records did not play a part in his diagnosis of poliomyelitis because nothing of a diagnostic nature was attempted. The only virology diagnostic test he saw in the Barnes record was the complement fixation test. He did consider abnormalities in the spinal fluid typical of polio which were shown in a cerebrospinal test.

"Dr. Thomas Moon, who admitted plaintiff to Barnes Hospital and who had treated her in the hospital until her discharge, gave an opinion of a somewhat similar nature, as did Dr. France Alexander, who was the assistant Director of the Rehabilitation Unit of the Irene Walker Johnson Institute and who directed the Rehabilitation efforts that were made in the plaintiff's case. Dr. Marvin Weber, who had been a resident neurologist at Barnes Hospital and one of the doctors who cared for and treated Mrs. Stahlheber, diagnosed that she had anterior poliomyelitis secondary to the ingestion of oral polio vaccine. He also considered the cerebrospinal fluid test and the results of an electro-myogram in making his diagnosis.

Dr. Joseph J. Gitt, who treated plaintiff in the Missouri Pacific Hospital, beginning on April 23, 1964, and also treated her in the Barnes Hospital until he was discharged by plaintiff on June 4, 1964, testified that the areas of the body that were paralyzed at the time he last saw her relate to a specific syndrome that falls into what he called the poliomyelitis syndrome clinically. He also said that in his opinion the picture she presented was one that is typical of poliomyelitis clinically and that his

clinical diagnosis as of May 16, 1964, was poliomyelitis. He testified that when he first saw plaintiff it was his opinion she had what is called a meningo-encephalitis (sic), and he treated her as such. He was also her doctor when she left the Missouri Pacific Hospital with a final diagnosis of Landry's paralysis, undetermined.

Dr. Marvin B. Weber of Toronto, Canada, testified on behalf of the plaintiff. He made a physical examination and neurological examination of her and in connection with that reviewed the hospital charts of the tests that were made of her and her care in the hospital. At the time he examined her, he entered an anatomical diagnosis without the hospital charts, and subsequent to his examination he found the records, reviewed the chart and entertained an etiological diagnosis or cause of her condition. He said he feels she had anterio-poliomyelitis (sic), secondary to the injection (sic) of oral polio vaccine. He said that in addition to the natural progress of the poliomyelitis disease in this case, he did have laboratory data to support a clinical diagnosis of polio. He said there was an electro-myelogram which unequivocally localized the lesion to the horn cells and no evidence involving any other cells. There was also a lumbar puncture and the examination of the spinal fluid under the microscope as well as the biochemical analysis of the spinal fluid for protein; both tests were entirely consistent with a diagnosis of anterior poliomyelitis. The anterior horn cell carries only motor nerves, nerves to muscles, and this is known as the peripheral nerve. The nerve known as the posterior root is entirely sensory and carries sensations of touch, pain, temperature and has nothing to do with movements.

"He also said from both clinical and laboratory evidence, the lesion or the disease is unequivocally in this part of the spinal cord in the anterior horn. There is slightly (sic) no evidence for the disease in the posterior horn and no evidence for the disease in any other part of the spinal cord, including the part where the upper motor

neuron descends. This is so characteristic of poliomyelitis, it is almost pathonomic. Almost no other disease affects that part of the nervous system of itself with no other part of the nervous system involved. He said there are other enternal (sic) viruses that rarely cause disease in this part of the spinal cord.

"Dr. Weber admitted that Dr. Moon had diagnosed plaintiff's illness on August 13, 1965, as a transverse myelitis. There was a note in the Barnes Hospital record by Dr. Weber dated November 18, 1965, which stated 'does not look like transverse myelitis; no reflexes and no sensory changes other than paraesthesia to lower extremities and hot and cold feeling in feet. Has atrophy of hands, spastic eminences but has never noted fasciculation. Has had occasional cramps again. Looks as if lesion is in anterior horn, roots or peripheral nerves.' On January 14, 1966, a note was made by Dr. Weber in the same hospital records as follows: 'Chart not available again; I don't have the EMG report—as I recall (I looked it up a month ago)—there was evidence of lower motor neuron involvement. This is a myelopathy involving anterior horn as well as white matter or perhaps a radiculopathy.' Dr. Weber said he made a diagnosis of poliomyelitis secondary to the vaccine, but he did not put it in the record. He said he did not see the patient after that January entry and there was no opportunity to put it in. He was at Barnes Hospital until 1967 but did not at any time make a diagnosis of poliomyelitis in the record. He said he was trying to think back as to what his reason was at that time and that laziness was probably one reason.

"He said other neurological diseases that resemble poliomyelitis which cannot be distinguished on a clinical basis were in rare cases Echo and Coxsackie virus infections. In discussing the criteria for 'compatibility' set forth in the Surgeon General's Report, Dr. Weber stated that he felt that criteria (sic) No. 3, that there must be no laboratory data not inconsistent (sic) with respect to multiplication of the vaccine virus fed, had been met in this case or it may never had (sic) been done. He referred to the spinal tap and the 177 cells and the increase in protein. The cells were characterized by neutrophil and later this changed to lymphocytes. This test was compatible with infection by poliomyelitis virus. The throat swab test was taken on the wrong day and it would have been much better earlier; and even then it is only a 50–50 chance of getting a positive culture when you do it once and not three or four times.

"As to the complement fixation test, it also had not been taken at the proper time, according to Dr. Weber. The acute phase was negative and that is perfectly consistent in his mind, because at that time the body hasn't had time to manufacture antibodies and you wouldn't expect complement fixing antibodies at that time. The convalescent phase is obtained 18 days after the acute phase; and the complement fixing antibodies, according to Dr. Weber, do not appear until after the third week of the disease and it was quite conceivable that it was drawn too early in this case; and there should have been more samples drawn at a later time than the time they were drawn. In 10% of the cases complement fixing antibodies never appear. He said the lack of the complement fixing antibodies was not negative evidence and still perfectly compatible with the diagnosis of poliomyelitis. A stool culture was never done, although it was ordered. Neutralizing antibodies were not ordered and the doctor believes that if these two tests had been done a sufficient number of times they would have proven positive; that this would have been proven poliomyelitis."

In the face of its own statement, appellant argues that the conclusions of plaintiffs' medical witnesses were not based upon reasonable medical certainty, but on guess, speculation and conjecture, and not upon facts substantiated by the evidence. Appellant asserts that "their testimony when [taken] as a whole, exposed their

lack of real knowledge of the subject about which they purported to testify, and their opinions—and especially on the question of causal connection—were clearly shown not to be based upon facts and adequate data, and not to have to support them, reasons and testimony of sufficient probative force to be substantial evidence."

Appellant did not question the qualifications of plaintiffs' medical witnesses. As appellant's own statement shows, Mrs. Stahlheber's treating physicians, Doctors Gitt, Moon, Weber and Alexander all testified that she had poliomyelitis. Certainly this conclusion was based upon an adequate knowledge of the nature of the disease and upon the direct personal observation of Mrs. Stahlheber during the course of her illness.

■■■■ Doctor Maxwell, who was not a treating physician, explained fully the basis of this conclusion that Mrs. Stahlheber had poliomyelitis. Doctor Maxwell did express his opinion as to diagnosis and cause of Mrs. Stahlheber's illness in terms of "I think it's reasonably probable that she has poliomyelitis." However, extensive cross-examination demonstrated that his testimony was a statement of opinion based upon his knowledge from actual experience in handling polio cases and his consideration and rejection of the other suggested possible causes for Mrs. Stahlheber's illness. Defendant's dismissal of his testimony as "based upon clinical grounds as it would have been twenty-five years ago" would, at best, go to the weight which the jury might have given his testimony, but would not destroy its probative value.

His acknowledgment that he had not been aware, in his direct testimony, that a throat wash test had been done, which was negative, was not such ignorance of a medical fact as would destroy the value of his testimony. He did explain that such a test might or might not be conclusive. He did likewise with the negative complement fixation test, which had also been omitted from plaintiffs' hypothetical question.

Likewise, Doctor Moon testified: "I believe she had anterior horn disease secondary to the ingestion of oral vaccine." Doctor Moon was a neurological resident at Barnes, one of the two admitting doctors who examined her and he was her attending physician until her discharge. At the time of her admission, he listed, on the hospital record, his impression that Mrs. Stahlheber was suffering from "myeloradiculopathy or radiculoneuritis" and nine possible causes. He explained fully his rejection of possible causes other than polio and stated: "I think at the time I first saw her I withheld making a final decision, but I think as I followed this woman over the course of her illness, I can say my primary impression is that she has had polio." Considered in the light of his entire testimony, which explained fully the basis for this "impression," we cannot reject Doctor Moon's testimony as not based on a reasonable medical certainty.

Appellant states that Doctor Moon admitted that he would not make a final conclusive diagnosis without laboratory tests suggested in the Surgeon General's report, which will be referred to below. However, Doctor Moon, in the cross-examination referred to, did not state that such laboratory tests would be required for a diagnosis of polio. The exact exchange between Doctor Moon and appellant's counsel was as follows:

"Q Doctor, let me ask you this, with your knowledge at the present day up to 1964, would you diagnose a case of poliomyelitis simply on clinical symptoms? A Would I do it?

"Q Yes, sir. A Certainly.

"Q You would? A Yes, sir.

"Q Without the aid of laboratory work at all?

"A No, I would like that to help me out and corroborate my presumptive diagnosis.

"Q My question was, Doctor, if you would with the knowledge—

"A   With the knowledge I have I can diagnose polio without the laboratory.

"Q   You can diagnose it without the laboratory?   A   Yes, sir."

We cannot, without unduly lengthening the opinion, treat in detail the argument leveled at the testimony of plaintiffs' other medical witnesses. The gist of the argument is similar to that leveled at the testimony of Doctors Maxwell and Moon. All testified fully as to the basis for their diagnosis of Mrs. Stahlheber's illness as poliomyelitis.

▬▬▬   The rule here applicable is that laid down in Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, where the court was considering whether or not plaintiff had a tumor, caused by a fall. In referring to the nature of the ailment, the court stated (66 S.W.2d l. c. 564 [3–5]) :

" * * * The opinions of experts based upon examination and treatment is substantial evidence and its weight is for the jury. O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55; Spencer v. Q., O. & K. C. R. Co., 317 Mo. 492, 297 S.W. 353; Scanlon v. Kansas City, 325 Mo. 125, 28 S.W.(2d) 84; Cropper v. Titanium Pigment Co. (C.C.A.) 47 F.(2d) 1038, 78 A.L.R. 737; note, 78 A.L.R. 755; 22 C.J. 639, § 733, p. 728, § 823; 11 R.C.L. 574, § 7, p. 584, § 14, p. 586, § 16; 1 Wigmore on Evidence, 1081, § 673; 4 Wigmore, 115, 116, §§ 1920, 1921. The doctors stated what opportunity for observation they had and gave the reasons for their opinions. We cannot say that the jury could not believe them. The fact that the matter could be more definitely determined by microscopic examination, and this was not made, would go only to the weight of their evidence."

The absence of positive laboratory identification of Types 1, 2 or 3 polio virus in this case is no more destructive of the probative value of plaintiffs' medical testimony than was the absence of microscopic examination in Kimmie. Appellant empha-sizes the absence of such tests. Undoubtedly, the discoveries of Doctor Enders which led eventually to the polio vaccines made possible much more definitive laboratory procedures as aids in the diagnosis of poliomyelitis. The two tests which appear to have been made in this case, the throat swab and the complement fixation tests, were negative. Plaintiffs' witnesses carefully explained that such result does not disprove the existence of polio. No test was made for the presence of polio virus in the fecal matter. There was evidence that one of the most specific tests is the virus neutralization tests. Although there was some evidence that blood was taken for use in such a test, which could not be made at Barnes, but had to be sent to the United States Public Health Service at Atlanta, there was no record that the result of such test had ever been received by any of Mrs. Stahlheber's doctors. The possibility that some such test, if made, would have been more definitive does not subject plaintiffs' evidence to the rule, invoked by appellant, that a party's evidence must be viewed with distrust when he produces weaker evidence when stronger evidence within the party's power to produce was available. 32A C.J.S. Evidence § 1035, p. 711. Mrs. Stahlheber's physicians considered the evidence available to them sufficient upon which to base their diagnosis. Certainly, plaintiffs were in no position to insist upon further procedures which might have been beneficial in litigation.

On the issue of causation, the medical testimony offered by plaintiffs was that Mrs. Stahlheber's poliomyelitis was caused by the ingestion of defendant's vaccine. The opinion was based upon the appearance of Mrs. Stahlheber's illness some 19 days after she took the polio vaccine. There was no known contact with another polio victim. There was no polio epidemic in the St. Louis area in April, 1964.

The Reports of the Special Advisory Committee on Oral Poliomyelitis Vaccine to the Surgeon General, Public Health Service, of September 20, 1962 and Decem-

ber 18, 1962, upon which the duty to warn in this case was essentially based, specified an onset of polio within a period of four to thirty days after feeding as one of the criteria upon which cases studied by the committee were deemed " 'compatible' with the possibility of having been induced by the vaccine." The plaintiffs' medical witnesses testified that they considered that criterion in arriving at their conclusion as to the cause of Mrs. Stahlheber's illness.

■ The opinions of the physicians as to the causal connection, demonstrated to have been based upon their medical knowledge, did constitute substantial evidence from which the jury could find the necessary element of causation.

We cannot discuss at length the authorities relied upon by appellant on the failure of plaintiffs to make a submissible case on the issue of causation. The cases are distinguishable.

In Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, plaintiff sought to show, as an element of damage in a personal injury case, that a heart condition was the result of an injury. The doctor relied upon to prove the causal connection testified merely that physical shock could cause the heart condition. However, he did not testify that it had, in fact, happened in the case, and he offered no opinion as to the effect of plaintiff's injuries on his pre-existing heart condition. 59 S.W.2d 645. There can be no doubt that, in this case, plaintiff's medical evidence did directly relate her illness to defendant's vaccine. The Adelsberger case also involved rejection of medical evidence as to whether pleurisy suffered by plaintiff was related to the injury. It did so because the doctor relied upon to prove that issue testified at one time that an X-ray taken on the day of the injury revealed pleurisy, which could not have been caused by the injury, and later the doctor testified that plaintiff did not have pleurisy at the time of the collision. The court rejected the inconsistent testimony in absence of some explanation to show which state-

ment was correct. 59 S.W.2d 647 [6,7], [8]. Such is not the situation in this case.

Morgan v. Rosenberg, Mo.App., 370 S.W. 2d 685, was a malpractice case in which expert testimony by the medical witness, relied upon to show lack of compliance with applicable standards, was based upon an assumption not shown by the evidence.

In Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 845, the testimony of an expert witness as to the function of a pressure relief valve involved in a gas explosion was rejected because the witness purported to conduct a test with the valve, but he admitted that before making the test he had altered the entire regulating system. 259 S.W.2d 851.

In Stewart v. Martin, 353 Mo. 1, 181 S.W.2d 657, plaintiff sued for damages claimed to have resulted from food poisoning caused by a barbecued ham sandwich sold by defendant. Plaintiff's physician only "thought" plaintiff's illness was caused by food poisoning and he made no definite statement either as to the nature or cause of the illness. The court found that such evidence left plaintiff's case "in the realm of speculation and conjecture." 181 S.W. 2d 658 [3, 4]. Here the medical testimony was definite and the facts upon which the opinions were based were fully shown.

Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S.W.2d 311, Van Bibber v. Swift & Co., 286 Mo. 317, 28 S.W. 69, and Craddock v. Greenberg Mercantile, Mo.Sup., 297 S.W. 2d 541, involved expert testimony on nonmedical questions. We find them of no assistance here, apart from the statement of the generally recognized rule here applied. Barnhart v. Ripka, Mo.App., 297 S.W.2d 787, involved rejection of a testimonial assertion of a witness about the location of a boundary marker when the witness's testimony taken as a whole demonstrated his lack of knowledge of the fact about which he purported to testify.

In the present case, not one but four treating physicians, plus one other physi-

cian, testified positively as to the nature of plaintiff's illness and its cause. The qualifications of the medical witnesses were not questioned. They explained at length the facts which they considered in arriving at their opinion. There has been no demonstrated lack of consideration of essential facts in arriving at such opinion and no showing of such inconsistencies in the testimony of any of the witnesses as would destroy the probative value of their testimony. Their testimony did constitute substantial evidence on the nature and cause of plaintiff's illness and made a submissible case on such issues. Kimmie v. Terminal R. R. Ass'n of St. Louis, supra; Schaefer v. Rechter, Mo.Sup., 290 S.W.2d 118, 123; Pijut v. St. Louis Public Service Company, Mo.Sup., 330 S.W.2d 747, 751; Braun v. Roux Distributing Co., Mo.Sup., 312 S.W. 2d 758, 766[5].

■ We reject the contention that no submissible case of failure to warn was shown. As above stated, a duty to warn may well have been found to have arisen from the Report of the Special Advisory Committee on Oral Poliomyelitis Vaccine to the Surgeon General, dated September 20, 1962, in which the committee stated:

*"Discussion Summary:*

"Of the reported cases to date, 1 following Type I vaccine and 11 following Type III vaccine were considered by the Committee to be clinically consistent with paralytic poliomyelitis and with laboratory findings which could not exclude a possible relationship to the administration of oral vaccine.

"As noted, a single case occurred within 30 days of Type I vaccine administration during a period of almost 9 months when approximately 20 million persons were fed Type I vaccine. This is wholly compatible with coincidental origin.

"The 11 cases following Type III vaccine cannot all be assumed to be coincidental. The adult age distribution ranging from 16 to 52 years with eight of the cases over 30 years of age, and the clustering of the intervals from vaccine feeding to onset in the 2–3 week period suggest a vaccine relationship. For these reasons the Committee concluded that 'there is sufficient epidemiological evidence to indicate that at least some of these cases have been caused by the Type III vaccines.'

"The incidence, assuming all cases to have been vaccine induced, is but 11 cases among more than 13 million fed. This is less than one case per million doses given. When the risk is related to age it is apparent that adults are exposed to a greater hazard than are children. Inadequate information on the age specific vaccine acceptance rate, however, makes it impossible to calculate a more precise estimate of the risk at this time.

"With the incidence of poliomyelitis at a low level in this country, the Committee therefore recommended that the Type III vaccine be restricted to preschool and school age children and to those adults in high risk groups, such as those traveling to hyperendemic areas or in areas where a Type III epidemic is present or impending."

That report was followed by a supplementary report, dated December 18, 1962, in which the committee stated:

"It is therefore recommended: (1) that community plans for immunization be encouraged, using all three types; and, (2) that immunization be emphasized for children in whom the danger of naturally occurring poliomyelitis is greatest and who serve as the natural source of poliomyelitis infection in the community. Because the need for immunization diminishes with advancing age and because potential risks of vaccine are believed by some to exist in adults, especially above the age of 30, vaccination should be used for adults only with the full recognition of its very small risk. Vaccination is especially recommended for those adults who are at higher risk of naturally occurring disease; for example, parents of young children, pregnant women, persons in epidemic situations and those planning foreign travel.

"Of greatest importance is the continuing vaccination of oncoming generations."

Appellant does not contend that, in view of this recommendation, it did not, as a matter of law, have a duty to warn. See Krug v. Sterling Drug, Inc., Mo.Sup., 416 S.W.2d 143; Bine v. Sterling Drug, Inc., Mo.Sup., 422 S.W. 623. We do not understand how it can contend that no submissible case on failure to warn was made in the face of its response to plaintiffs' request for admissions. The response, placed in evidence, read as follows:

"Number ten. Admit that prior to April 5, 1964, the defendant had knowledge of the U. S. Public Health Service recommendation that Type 3 oral poliomyelitis vaccine in mass immunization campaigns should be limited to preschool and school age children only, and to adults in epidemic areas or those traveling to epidemic areas. That is admitted.

"Number eleven. Admit that the defendant's Trivalent Orimune which was delivered for mass inoculation on April 5, 1964, to the Crestwood Elementary School, Crestwood, Missouri, contained Type 3 polio live virus vaccine. That is admitted.

"Number twelve. Admit that the defendant, on April 5, 1964, and prior thereto, gave no specific warning to the charities or to the persons who dispensed the vaccine to the persons consuming same, against dispensing the vaccine to adult persons. That is admitted.

"Number thirteen. Admit that on April 5, 1964, and prior thereto, the defendant gave no specific [warning] to the charities or to the persons dispensing the vaccine to the consumers thereof against dispensing Type 3 oral poliomyelitis vaccine to adult persons. That is admitted.

"Number fourteen. Admit that the defendant on April 5, 1964, or prior thereto, gave no specific warning to the adult persons who consumed the vaccine on April 5, 1964, that defendant's Trivalent Orimune contained Type 3 vaccine. That is admitted.

"Number fifteen. Admit that the defendant on April 5, 1964, or prior thereto, did not warn any of the adult persons who took the defendant's Trivalent Orimune vaccine on April 5, 1964, that the U. S. Public Health Service had recommended against the taking of Type 3 vaccine by adult persons. That is admitted as to warning. Denied as to PHS recommendations. Recommendations of the U. S. Public Health Service did not specify that adult persons should refrain from ingesting Type 3 oral poliovirus vaccine."

Appellant contends that the trial court erred in admitting plaintiffs' Exhibit No. 25. That exhibit was a publication of the Surgeon General of the United States Public Health Service, entitled "Communicable Disease Center Poliomyelitis Survey." It was dated September 30, 1964, and included a Report to the Surgeon General by the Advisory Committee on Oral Polio Vaccine, which had met July 17–18, 1964. The committee was the same committee which produced the 1962 report referred to previously.

Plaintiffs' counsel used the report, as found in Exhibit No. 25, in cross-examining two of defendant's witnesses who were members of the Advisory Committee. In the course of defendant's case, defendant's counsel read excerpts from the report to the jury.

In plaintiffs' rebuttal, plaintiffs' counsel stated:

"MR. SOMMERS: Plaintiffs' Exhibit 25 has not yet been introduced. I did read a portion of it to the jury in the form of a JAMA article in which Your Honor ordered stricken on the motion of counsel. I re-offer that exhibit and I won't bore the jury with re-reading it. Since they have referred to this exhibit and read it, I take it it's now proper to put it in."

Defendant's counsel objected as follows:

"MR. ROBERTSON: I am objecting to it, the only reason I made reference to it was the five articles he was interrogating the Doctor about and it is a matter of publication published subsequent to the incident in question, namely September, 1964, and I don't think it sets up new recommendations which were not in existence at the time of the manufacture of the product, and the administration thereof to the plaintiff through the City-County Charities, Inc., so that the regulations or recommendations could not by any stretch of the imagination be retroactive as far as the defendant is concerned in the manufacture of the product."

The objection was overruled. Plaintiffs' counsel proceeded:

"MR. SOMMERS: This is Exhibit Number 25, for the Plaintiffs, which is the Poliomyelitis Surveillance, the official report, and of that section therein which is the epidemiological summary which was prepared by Dr. Donald A. Henderson, who was chief of the surveillance section, epidemiological section, CDC. John J. Witte, who was formerly chief of the poliomyelitis surveillance unit, CDC, and presently chief of the measles surveillance unit. Leo Morris, assistant chief surveillance section CDC, and Dr. Alexander D. Langmuir, chief of the epidemiology branch CDC, and I want to read that section which is on page 10 of that report entitled, 'Relative Frequency of Compatible Cases.' The incidence of 'compatible' and total cases in children and adults by quarter-year periods from January 1962 to June 1964 is shown in Table 7. Although there has been a marked decline in the incidence of total cases over this time span, the frequency of 'compatible' cases has not declined proportionately. Among children the relative frequency of 'compatible' cases to the total was about 2 per cent in 1962 and 1963. This rose somewhat during the first half of 1964, although because of the small numbers of cases involved, this increase may not be significant. Among the adults in

1962, 19 per cent of the total cases were 'compatible.' In 1963, this proportion rose to 33 per cent, and in 1964, 10 of 14 cases or 71 per cent were 'compatible.' "

Defendant's counsel moved that the "answer" be stricken for the same reasons stated before. The objection was overruled and the entire exhibit was then offered and received in evidence. Plaintiffs' counsel referred, in the opening portion of the final argument, to the statistics which he had read from Exhibit 25 regarding the incidence of polio in adults.

■ Appellant's assignment of error on this point is as follows:

"The court erred in admitting into evidence Exhibit No. 25 over the objection of defendant, purporting to be a poliomyelitis surveillance report of the U. S. Public Health Service, because said exhibit contained hearsay, and hearsay upon hearsay, and conclusion and self-serving evidence not binding on this defendant. Said exhibit deprived the defendant of its right of cross-examination and contained statements concerning cases of poliomyelitis wholly unrelated to the case at hand and constituted an academic discussion of poliomyelitis which was used as direct evidence of the statements contained therein and of the truth thereof."

Comparison of the assignment of error here with the trial objection shows clearly that the error here urged has a different basis from the trial objection. No objection based on hearsay was raised at the trial. The objection basically was that the report had been issued after Mrs. Stahlheber had taken the vaccine and therefore its recommendations were not retroactive insofar as defendant's manufacture of the product was concerned. When plaintiffs' counsel read from the Epidemiological Summary contained in Exhibit No. 25, defendant's counsel made no new objection, contenting himself with a repetition, by reference to his original objection.

We cannot convict the trial court of error in the admission of evidence unless the basis for review has been properly laid in the trial court by a timely objection to the questioned evidence, setting forth the grounds of objection. Stafford v. Lyon, Mo.Sup., 413 S.W.2d 495, 497–498[1–3]; Appelhans v. Goldman, Mo.Sup., 349 S.W. 2d 204, 207[4–6]. The grounds of error to be considered in this court must be those which were presented to the trial court. An objection on one ground below cannot be shifted to a different ground in this court. Thus, a trial objection to testimony as a conclusion affords no basis for review in this court on the ground of hearsay. Hall v. Clark, Mo.Sup., 298 S.W.2d 344, 350 [14]. Objection, on appeal, that testimony was self-serving may not be based upon a trial objection that it was hearsay. Mitchell v. Robinson, Mo.Sup., 360 S.W.2d 673, 676 [1]; Dunn v. Alton R. Co., Mo.App., 88 S.W.2d 224, 228[1].

■ The objection voiced at the trial of this case was not that asserted in this court. We are authorized to reverse the trial court's judgment only for error committed by the trial court against the appellant. Section 512.160, subd. 3, RSMo 1959, V.A.M.S. We cannot say the trial court erred on a question not properly presented to it. Thomas v. Wade, Mo.Sup., 361 S.W. 2d 671, 675[4, 5]; Negley B. Calvin, Inc. v. Cornet, Mo.App., 427 S.W.2d 741, 746 [5, 6].

■ Appellant did, in this case, assert the grounds here urged in its motion for new trial. This was not a timely presentation of the matter to the trial court. Brown v. Thomas, Mo.App., 316 S.W.2d 234, 237 [8].

The objection here raised not being that properly before the trial court, we do not consider the claim now asserted.

Plaintiffs' verdict-directing instruction read as follows:

"Your verdict must be for plaintiffs if you believe:

"First, defendant sold 'Trivalent Orimune' for human consumption, and

"Second, said product when sold would cause poliomyelitis to some persons and was thereby dangerous to some persons using said product in the manner and for the purpose intended, and

"Third, defendant knew or, by using the skill of an expert in defendant's business, could have known of the dangerous potentiality of said product, and

"Fourth, the plaintiffs did not know and by using ordinary care could not have known of the dangerous potentiality of said product, and

"Fifth, defendant failed to give any warning of such dangerous potentiality of said product, and

"Sixth, defendant was there negligent, and

"Seventh, while the product was being used in the manner and for the purposes intended, plaintiffs were damaged as a direct result of such dangerous potentiality."

Appellant attacks the instruction on numerous grounds. The submission of failure to give any warning is attacked on the grounds that there was no evidence to support it. As above pointed out, the response of appellant to the request for admissions was sufficient to support a finding on the issue so there was no absence of evidence for its submission.

Plaintiffs admitted that a pamphlet was delivered to City-County Charities, Inc., with the vaccine. The pamphlet, published by Lederle and bearing a notation "Printed in U.S.A., Oct., 1963," contained 21 questions and answers about defendant's vaccine. Question 17 and the answer were:

"17. What is the prevailing medical opinion regarding possible toxicity of the type 3 Sabin strain used in the vaccine?

"This is expressed in the News Letter for August, 1963 of the American Academy of Pediatrics as follows: 'Data from field

trials do not implicate the safety of OPV (oral poliouvirus vaccine) 1, 2 or 3 when used in the pediatric group. Only in adults receiving type 3 has a question of safety been.raised following administration of the vaccine during the summer season of 1962 when less than one per million vaccinees developed a neurologic disease resembling poliomyelitis. Critical analysis did not prove that any of the illnesses could be attributed to the vaccine virus and their true significance is still under study.' "

▬ Plaintiffs contend that this was, in fact, no warning. This argument is emphasized by the statement found on page 12 of the pamphlet: "There are no known contraindications to oral poliovirus vaccine." That defendant persisted in this position, despite the precautions advised by the Surgeon General's Committee in its December 18, 1962 report would, at least, justify the conclusion that the answer to Question 17 was intended, not as a warning, but as a reassurance of the absolute safety of the vaccine. Certainly this statement did not foreclose a submission and finding that defendant failed to give any warning.

Appellant also contends that the instruction was erroneous for ignoring the defendant's position that the pamphlet had been provided to City-County Charities, Inc. and that the pamphlet was an adequate warning. Appellant offered no instruction submitting any affirmative defense. · Nor did it converse any of the specific factual issues submitted by plaintiffs. Plaintiffs were entitled to consider the statement as no warning. If defendant wished the jury to consider whether the warning which the pamphlet provided was adequate, they had an opportunity to do so and did not take advantage of it. No duty was imposed by law upon plaintiff to consider the pamphlet in drawing his instruction. This is not a Moore v. Ready Mixed Concrete Company, Mo.Sup., 329 S.W.2d 14, situation. The cases of West v. Jack Cooper Transport Co., Mo.Sup., 381 S.W.2d 872, and Mann v. Payne, 349 Mo. 89, 159 S.W. 2d 602, cited by appellant, are not in point.

▬ Appellant attacks the instruction as giving a "roving commission" to the jury because it failed to link the negligence submitted in paragraph "Sixth" to the danger and failure to warn referred to in paragraph "Second" through "Fifth." This argument is based upon the use of the word "there" in· paragraph "Sixth," "defendant was 'there' negligent, * * *." The word "there" has been substituted for the word "thereby" in this phrase. See MAI 31.01.

We do not consider the use of the word "there" instead of "thereby" so misled the jury that they would not have understood that the negligence referred to in paragraph "Sixth" related to the matters previously submitted in the instruction. The definition of the word "there" includes: "4: in that matter; in that respect, in relation to that * * *." Webster's Third New International Dictionary (1961). We cannot, therefore, say that there was no connection between paragraph "Sixth" and the prior paragraphs of the instruction. We also note Instruction No. 4, offered by defendant, which conversed the negligence submission, as follows: "Your verdict must be for defendant unless you believe that the defendant was negligent as submitted in Instruction No. 3 and that plaintiffs sustained damage as a direct result thereof." This would serve to emphasize that the negligence involved was that based upon the matters submitted by Instruction No. 3. The case was clearly tried on that basis and we believe that the jury would not have been misled by the use of the word "there" in paragraph "Sixth". The test is not absolute perfection, but whether the instruction was "substantially correct." We conclude that it was. See Wegener v. St. Louis County Transit Company, Mo.Sup., 357 S.W.2d 943, 948–949[3, 4]; Bollman v. Kark Rendering Plant, Mo.Sup., 418 S.W. 2d 39, 49–50[23, 24].

▬ Appellant has cited cases in which there was no connection in the instruction between the specific acts of negligence charged and the required finding of neg-

ligence, coupled with instruction which also submitted general negligence. Such was the situation presented in Endermuehle v. Smith, Mo.Sup., 372 S.W.2d 464, and Heimos v. Bruce, Mo.Sup., 393 S.W.2d 477. Pollard v. General Elevator Co., Mo.Sup., 416 S.W.2d 90, was a case in which the trial court had granted a new trial on the basis of such an instruction. The court in that case noted the greater liberality of appellate courts in sustaining a trial court's granting of a new trial. 416 S.W.2d 96. Gousetis v. Bange, Mo.Sup., 425 S.W.2d 91, involved an omission of the connecting language, not the situation here. Furthermore, the decision was based, in part, upon the nondeviation from MAI requirement. See Brown v. St. Louis Public Service Company, Mo.Sup., 421 S.W.2d 255, 259[3]. Neither before the instruction was given nor in the motion for a new trial did appellant charge that Instruction No. 3 deviated from MAI. We, therefore, do not consider that charge either in this connection or in connection with the charge that the instruction failed to designate the person to whom the product was sold, as required by MAI 31.01. Supreme Court Rule 79.03, V.A.M.R.; Miller v. Gulf, M. & O. R. Co., Mo.Sup., 386 S.W.2d 97, 104[12]; Wolfe v. Harms, Mo.Sup., 413 S.W.2d 204, 213[17].

Plaintiff Robert Stahlheber has appealed on the grounds that the $20,000 verdict and judgment on his claim for damages is so grossly inadequate as to demand a new trial on the issue of his damages.

Mr. Stahlheber's appeal is based on the claim that the undisputed evidence showed that his wife had been rendered an almost complete invalid who would require constant attention around the clock. According to plaintiff's evidence, Mrs. Stahlheber's mother, then 74 years of age, had moved into the Stahlheber house and had cared for her daughter. Mr. Stahlheber paid her $120 per month for her services. Plaintiff contends that, in view of Mrs. Stahlheber's mother's age, her assistance will not be available much longer, so that

he will eventually be required to employ, at least, ordinary domestic help to care for Mrs. Stahlheber, the Stahlheber family and the household. Plaintiff's evidence showed that ordinary domestic help would receive $1.50 per hour. Plaintiff computes the annual cost of such help, for three eight-hour shifts each day, at $13,140. He argues that, in view of the $14,000 expenditure for Mrs. Stahlheber's care to the time of the trial and the nature of the loss to him by reason of his wife's being a total invalid unable to perform any of the normal duties of a wife and a mother, the $20,000 verdict is not even compensatory of the damages suffered by him to the time of trial, and ignores completely the damage he is certain to sustain in the future. He contends that the verdict is so grossly inadequate that it indicates misconduct on the part of the jury in ignoring the court's instruction that, if it found for Mr. Stahlheber, it should award him such amount "as you believe will fairly and justly compensate [him] for any damages you believe he sustained and is reasonably certain to sustain in the future * * *."

Numerous cases have laid down the principles which guide this court in considering an appeal based upon a claim of an inadequate award of damages. See Roush v. Alkire Truck Lines, Mo.Sup., 245 S.W.2d 8, 10[1], [2], [3]; Waller v. Oliver, Mo.Sup., 296 S.W.2d 44, 49[7, 8]; Combs v. Combs, Mo.Sup., 284 S.W.2d 423, 427[8]; Schrock v. Lawrence's Estate, Mo.Sup., 327 S.W.2d 836, 837[1]; Pinkston v. McClanahan, Mo.Sup., 350 S.W.2d 724, 728–729[2], [3], [4–6]. Generally the appellate court does not weigh the evidence, but considers only whether the trial court abused its discretion in denying a new trial on the grounds of the inadequacy of the verdict. Determination of this question depends primarily upon whether the verdict is responsive to the evidence on the question of damages. Nichols v. Blake, Mo.Sup., 395 S.W.2d 136, 141[4, 5]. Also to be kept in mind is the rule that, even though plaintiff's evidence on his pecuniary loss is uncontroverted, the weight and sufficiency of

the evidence is a matter for the jury, particularly on the issue of damages. Spica v. McDonald, Mo.Sup., 334 S.W.2d 365, 368 [1]. A jury may find against the party having the burden of proof in the face of his own uncontroverted evidence. Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 559 [1-3].

In this case, practically all of the evidence on the issue of damages came from plaintiffs and their witnesses. The only doctor testifying on behalf of defendant who had examined Mrs. Stahlheber agreed with plaintiffs' evidence that Mrs. Stahlheber's condition was permanent. He did state that he found that Mrs. Stahlheber could sit up with difficulty, contradicting her testimony that she could not do so.

■ At the trial, defendant did not question the some $14,000 expenses incurred by Mr. Stahlheber to that time. On this appeal defendant does not assert that there is any evidentiary support for a finding of actual out-of-pocket expenses to the time of trial other than the $14,000 claimed. This would leave the sum of $6,000 for compensatory damages to Mr. Stahlheber for the complete loss of the services, assistance, society and consortium of his wife at the age of 41. We question whether this amount would adequately compensate Robert Stahlheber for this loss, but when considered in the light of the evidence about the necessity for future care, the amount awarded the husband is obviously inadequate.

Respondent's argument in support of the verdict is essentially that the jury may well not have been convinced that Mrs. Stahlheber was wholly incapacitated to the extent that she would require 24-hour care in the future. Respondent also argues that the jury might not have believed the testimony about the assistance rendered by Mrs. Stahlheber's mother, who did not testify, or that she had been compensated by Mr. Stahlheber, inasmuch as no documentary proof of such payments had been offered.

■ However, these suggestions as to what the jury might have found are met, practically head-on, by the verdict in favor of Mrs. Stahlheber for $130,000, which must have been predicated upon the jury's finding that she had been made, for all practical purposes, an invalid with little, if any, hope of future improvement. The jury obviously could not believe plaintiffs' evidence in support of Mrs. Stahlheber's claim and have disbelieved it in support of Mr. Stahlheber's claim. See Manley v. Horton, Mo.Sup., 414 S.W.2d 254, 261[15, 16].

Defendant suggests that the jury may have considered that the total of the award to both plaintiffs of $150,000 would provide, upon a conservative investment, an income of $9,000 per year which the jury might have considered adequate for Mrs. Stahlheber's future care. However, the adequacy of Mr. Stahlheber's damages is not to be viewed in the light of the total awarded him and his wife. The damages sustained by Mr. Stahlheber were separate and apart from those sustained by his wife. They stand on their own base and require consideration in the light only of the damages sustained by him. Gooch v. Avsco, Incorporated, Mo.Sup., 340 S.W.2d 665, 670 [10].

Therefore, viewing the evidence of Robert Stahlheber's damages in the light most favorable to the verdict, we must conclude that the trial court's action in overruling his motion for a new trial on the ground that the verdict in his favor was inadequate constituted an abuse of the trial court's discretion.

■ Plaintiff Robert Stahlheber has suggested that any inadequacy in the verdict in his favor be corrected by this court through the device of an additur, which would give defendant the alternative of either consenting to the amount to which the judgment would be increased or standing a new trial on the issue of damages. Plaintiff prayed for an additur of $150,000 in the trial court. Here, he suggests that,

in view of Massey v. Berlo Vending Company, Mo.Sup., 329 S.W.2d 772, and Gooch v. Avsco, Inc., supra, in which judgment for the husband for loss of his wife's services, etc. was in the amount of approximately six times his out-of-pocket expenses, the judgment here should be increased to at least $84,000, or six times his $14,000 out-of-pocket expenses.

In advancing the argument, it is conceded that Missouri has never applied the doctrine of additur. We have been cited no case in which the employment of such doctrine has been suggested in this state. Plaintiff argues that the doctrine is a logical corollary of the remittitur doctrine, frequently applied by Missouri trial and appellate courts. This argument was rejected in one of the early remittitur cases. Burdict v. Missouri Pacific Ry. Co., 123 Mo. 221, 27 S.W. 453, 26 L.R.A. 384. There, in upholding the application of the remittitur doctrine by an appellate court, the author of the majority opinion stated (27 S.W. 458):

"An argument pressed upon our consideration in this case is this: That, if this court has the right and power to reduce the damages when excessive, it has the right and power to increase them when inadequate. We do not see the force of this line of argument. In one case the court simply says the judgment may stand for a part of the amount found by the jury, while in the other case it would add something never within the terms of the verdict."

The additur doctrine is applied in several states. See Fisch v. Manger, 24 N.J. 66, 130 A.2d 815; Genzel v. Halvorson, 248 Minn. 527, 80 N.W.2d 854; Clausing v. Kershaw, 129 Wash. 67, 224 P. 573. In Jehl v. Southern Pacific Company, 66 Cal. 2d 821, 59 Cal.Rptr. 276, 427 P.2d 988, the California Supreme Court, in an exhaustive and enlightening opinion by Judge Traynor, recently accepted the doctrine.

Whatever might be the arguments in favor of the additur doctrine, we reject it in this case. The inadequacy of the verdict in

this case seems to be based primarily upon the jury's failure to give proper consideration to the issue of future damages for plaintiff Robert Stahlheber. An attempt to measure the amount of such damage, either on the basis of the record alone or on the basis of a mathematical formula as suggested by appellant, would not provide a proper consideration of this necessarily factual issue.

Judgment in favor of Virginia Stahlheber affirmed. Judgment in favor of Robert Stahlheber reversed and cause remanded as to him for new trial on issues of damages only.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

SEILER, P. J., HOLMAN, J., and HENLEY, Alternate Judge, concur.

STORCKMAN, J., not sitting.